### COMMONWEALTH vs. EDWARD G. PERKINS.

Suffolk.   November 4, 1915. — March 1, 1916.

Present: RUGG, C. J., LORING, BRALEY, DE COURCY, & CROSBY, JJ.

*Harbor of Boston*, Regulations of harbor master.   *Harbor Master.*

A regulation made by the harbor master of the harbor of Boston, that sailing vessels shall anchor in a part of a designated area off Bird Island flats that is not "reserved for steamers, exclusively," means that a vessel must anchor so that at all times it will lie wholly within the area designated for vessels of that class, and so construed the regulation is a reasonable one and therefore valid.

LORING, J.   This is a complaint against the master of a towboat for allowing a schooner which he had in tow to anchor in violation of R. L. c. 66, §§ 21, 28, in a place not provided for the anchorage of schooners by the regulations of the harbor master of the harbor of Boston.

No question was made as to the constitutionality of R. L. c. 66, § 21, nor as to the adoption by the harbor master of the regulation in question. The case went to the jury on a defence of necessity set up by the defendant. Under instructions as to that defence, to which no exception was taken, the jury found the defendant guilty.

The presiding judge * ruled as matter of law that the regulation in question was valid and to that ruling the defendant took an exception.

---

* *Callahan, J.*

The regulation in question provided (first) that all vessels anchoring in the upper harbor should anchor within a defined area about one thousand feet wide and six thousand feet long lying off Bird Island flats, and (secondly) that the upper quarter of this area (referred to at the trial as "area A") should be "reserved for steamers, exclusively." The defendant allowed the schooner which he had in charge to anchor within area A.

We are of opinion that this regulation was reasonable and therefore valid.

1. It must be apparent even to one not conversant with such matters that sailing vessels with their masts and rigging and steamships with none or substantially none will swing (when at anchor) in different directions if the wind is blowing in one direction and the tide running in another. And that by reason of this if the two kinds of vessels are lying close to each other as they must at times lie in the limited anchorage of the upper harbor, they will be apt to foul one another when at one and at the same time there is a strong tide running in one direction and a high wind blowing in another. The object of the regulation here in question was to avoid such collisions taking place under those conditions. And such in effect was the testimony of the harbor master as to the purpose he had in mind in adopting the regulation here in question. To this should be added that the harbor master testified that until within "two or three or four years" "the steamer fleet has [had] increased from nothing up to about sixteen in the fleet." By this we understand the harbor master to have meant that until within two or three or four years there was no occasion for the adoption of the regulation here in question. This regulation was adopted on May 20, 1914.

If the true construction of the regulation had been (as the defendant has contended that it is) that a vessel did not violate the regulation where it dropped its anchor within the area and swung when at anchor outside of it, there might perhaps be difficulty in coming to the conclusion that the regulation was a reasonable one. Upon that question we do not find it necessary to express an opinion. In our opinion the regulation by its true construction provides that a vessel must anchor so that at all times it will lie wholly within the defined area.

2. Beside attacking the validity of the regulation on the ground

that it was not reasonable the defendant has contended that "the harbor master has assumed in the regulation, not only a directive power, but a prohibitive power, and it is therefore invalid." There is nothing in this objection. By this regulation it is in effect provided that sailing vessels should anchor in that part of the described area off Bird Island flats which is not thereby reserved for steamers exclusively.

3. The defendant further has contended "that the subject matter of the regulation here in question is not in and of itself the proper subject of penal restraint, and entirely within the cognizance of the court, which neither requires nor admits of evidence, and therefore that the trial judge erred in not receiving the evidence offered by the defendant which tended to show the circumstances and conditions upon which the regulation would operate." The offers of proof made by the defendant and excluded by the presiding judge were six in number and are set forth below.* There is nothing in these offers of proof which would aid the court in giving to the regulation in question its true construction.

4. We have examined all the cases cited by the defendant. There is nothing in them which requires special notice.

The entry must be

*Exceptions overruled.*

The case was submitted on briefs.

*B. B. Libby,* for the defendant.

*A. C. Webber,* Assistant District Attorney, for the Commonwealth.

---

* The offers of proof excluded by the presiding judge were as follows:

"1. That Bird Island Anchorage has always been an anchorage for deep-draught vessels, that it is the most convenient anchorage in Boston Harbor for such vessels to use upon arrival, and that until May 20, 1914, there has been no regulation restricting the use of the anchorage in favor of any class of vessels.

"2. That on April 13, 1914, the harbor master sent the following letter to the various towboat companies operating in Boston Harbor:

"City of Boston,
Police Department, office of the Harbor Master
Police Station No. 8, April 13, 1914.

"Gentlemen,—I do not wish to discriminate against any class of vessels in their use of the Bird Island Anchorage, but it is my opinion that vessels that

---

require a berth for a few hours or for a day or so at most and are arriving almost
daily should be allowed some choice of berth against those who are using the
anchorage to remain sometimes for weeks at a time.

"You are hereby requested to instruct your captains that whenever possible
they will keep the berth on the upper corner of said basin clear.

Very respectfully yours,

Capt. Francis J. Hird,

Harbor Master."

"3. That on May 20, 1914, the harbor master made the regulation re-
serving the upper corner of said anchorage solely for steamers."

"5. That the schooners using Bird Island Anchorage are all of American
register, while a fair percentage of the steamers which use it are of foreign
register. That the portion of Bird Island Anchorage open to schooners is
frequently congested at a time when that reserved for steamers is clear.

"6. That enforcement of the regulation as made would cause loss to tow-
boat companies and sailing vessel owners.

"7. If material, that it is the opinion of captains, owners and agents that
the regulation is unnecessary and arbitrary, and an unjust discrimination
against American sailing vessels."