Town of Scituate *vs.* Burton D. Maxwell & another (and a companion case [1]).

Plymouth. May 26, 1959. — June 19, 1959.

Present: Wilkins, C.J., Spalding, Counihan, Whittemore, & Cutter, JJ.

*Harbor. Words, "Vessel," "Marina."*

In G. L. c. 102, §§ 19–26, relating to the control of "vessels" by a harbor master, that term is used in the ordinary sense of ships, boats, or barges, and does not mean structures even if they consist in part of floats. [440]

A "marina" consisting of a series of floats secured by heavy moorings in a harbor and so arranged that boats can be tied up to them is not a "vessel" subject to the control and power of removal of the harbor master under G. L. c. 102, §§ 19–26. [440–441]

Two bills in equity, filed in the Superior Court on May 21, 1958, and June 3, 1958, respectively.

Interlocutory decrees were entered by order of *Morton, J.*, and final decrees by order of *Voke, J.*

The cases were submitted on briefs.

*Walter J. Skinner*, for the town of Scituate and others.

*Gerald E. Bruen*, for Maxwell.

---

[1] The companion case is Burton D. Maxwell *vs.* Selectmen of Scituate & another.

CUTTER, J. On the westerly side of the harbor at Scituate is a town parking area. The defendant, The Welch Co. (hereinafter called Welch), owns land which adjoins the parking area on the north. At the northerly end of Welch's parcel is a pier which extends into the harbor about one hundred feet. Between the northerly edge of the parking area and the southerly side of the wharf is an area of water, about five hundred feet in length and varying in width from one hundred to two hundred feet, set back somewhat from the main harbor. "Boats in this area . . . are at no time in the path of boats proceeding southerly by the end of . . . [Welch's] wharf and by the easterly edge of" the parking area. "Prior to the spring of 1958, there was an island . . . which at low tide covered a substantial part of this area." In February and March, 1958, the department of public works of the Commonwealth (the department) dredged about nine acres in Scituate harbor "to provide for six feet of water at mean low water" and this "dredging was extended to include removing the island in the area between" Welch's wharf and the parking area. As a consequence, "more space became available in the inner harbor for the mooring of boats. This would necessarily result in some increased traffic between the inner and outer harbors. The entrance to the inner harbor from the outer harbor is by the northerly end of" Welch's wharf.

Late in 1957 the harbor master of Scituate suggested the installation of a marina[1] in the area between Welch's wharf and the parking area. Welch was not interested but one Maxwell (a defendant in one of the present suits and the plaintiff in the other) did talk with the harbor master "who approved the project at that time." Maxwell and the town's selectmen thereafter (and prior to April 29, 1958) studied the project and Maxwell and one selectman visited "the department . . . to find if any permit was necessary . . . and learned that none was required." Up to April 29, 1958,

---

[1] "A marina is an arrangement of floats in the form of an 'L' or a 'T', moored in the water, and so arranged that . . . boats . . . can be tied up to the marina. Anyone with a boat tied up to the marina would walk from the shore onto the floats down to his boat."

there was "no apparent opposition by the selectmen to the placing of the marina off the Welch . . . property."

"Maxwell ordered fourteen moorings, each weighing two tons, made of . . . concrete, 4½ feet square and 1½ feet thick" on each side of which "is a ¾ inch rod cast in the block." These were delivered on April 28. By then Maxwell had ordered materials for ten floats, each six feet wide and twenty feet long, later built.

Protests about the marina were made to the selectmen at their meeting on April 29. About this time the harbor master told Maxwell "that the picture had changed . . . [and] that he would not approve the marina unless . . . so directed by the selectmen."[1] On May 7, Maxwell wrote to the harbor master of his intention to proceed to build the marina. On May 9, the harbor master wrote to Maxwell "that the marina . . . would constitute a menace to navigation and could not be sanctioned by him." When Maxwell received this letter he had constructed two floats and thereafter he built eight more.

On May 21, the town brought a bill to enjoin Maxwell from placing the floats. A preliminary injunction was denied. Thereupon Maxwell finished the marina which extended out from the shore one hundred forty-two feet and then turned in a northerly direction toward the wharf about sixty feet. It was Maxwell's intention later to extend the marina three hundred feet toward the wharf.

On May 26, the harbor master told Maxwell that he was compelled to give him notice to remove the floats, and on May 26 by mail gave him such notice to do so within twenty-four hours. After obtaining the agreement of the selectmen to "share in the responsibility" the harbor master retained one Gilley and, through him, one Wheeler to remove the floats and they started to do so, in the presence of the harbor master and one selectman, less than twenty-four hours from Maxwell's receipt of the notice to remove.

On June 3, 1958, Maxwell filed a bill in equity against the

---

[1] It appeared that the marina would conflict with a bait pier near the parking space which had been at some time under discussion by town officials.

selectmen, the harbor master, Gilley, and Wheeler,[1] seeking to restrain interference with the marina and for other relief. The suits were referred to a master. The facts stated above are based upon his report.

The master also found (a) "that the harbor master, in good faith, ordered the removal . . . under the belief that he had authority . . . under" G. L. c. 102, § 24; (b) that the harbor master's "determination . . . that the marina constituted a menace to navigation was based on speculation and apprehension as to . . . possible interference with ordinary traffic in the channel . . . that such possibility was remote . . . [and] that this determination . . . , in all the circumstances, was unreasonable"; (c) that the harbor master's order of May 26, 1958, "to Maxwell was arbitrary and unreasonable"; (d) that Maxwell's moorings "complied substantially" with regulations of the harbor master made under G. L. c. 102; (e) that there was no evidence that these regulations had been published or communicated to Maxwell; and (f) that, although a regulation of the harbor master required that mooring permits be obtained, there was no evidence that the regulation had been published and the evidence showed that no such permit had ever been issued to anyone. The master ruled that the marina was not a vessel within the meaning of G. L. c. 102, § 24.

The trial judge confirmed the master's report, denied a motion to recommit the report, and overruled the exceptions of the town and its officers to the report. Final decrees were entered dismissing the town's bill and permanently enjoining the defendants in the suit by Maxwell from interfering with the installation and operation of the marina. The town and its officers seek review of the various decrees by bills of exception and appeals.

1. By G. L. c. 102, § 19, the selectmen of a town with an improved harbor are directed to appoint a harbor master. By § 21 each master of a vessel is directed to "anchor his vessel according to the regulations of the harbor master,

---

[1] The case against Gilley and Wheeler was dismissed.

and . . . [to] move to such place as he directs." Under § 24 a harbor master at the owner's expense may "cause the removal of any vessel . . . not moved when directed by him." By § 26, a harbor master "may regulate and station all vessels in the streams or channels of his harbor."

The powers given to a harbor master relate to the control of "vessels." Examination of G. L. c. 102, §§ 19–26, persuades us that the Legislature used the term "vessel" in its ordinary sense of a ship, boat, or barge. Nothing in the language of the sections, or in the decided cases discussing them, suggests any grant of power to harbor masters to control structures, even if they consist in part of floats. See *Commonwealth* v. *Perkins*, 223 Mass. 84, 85–86. With reference to what is now § 23, see *The Clover*, 1 Lowell, 342 (D. Mass.).[1] Some support to our interpretation of §§ 19–26 may also be given by c. 102, § 27.

2. By G. L. c. 91, §§ 10[2] and 14 (as amended respectively through St. 1931, c. 394, § 59, and St. 1931, c. 426, § 206), the department is given certain powers with respect to harbors and structures therein. Section 10 gives to the department "general care and supervision of . . . harbors" and § 14 provides that the department may license wharves, piers, or other structures. In view, however, of our holding as to the powers of the harbor master, we need not decide whether this marina is essentially a floating pier with mooring accessories and thus sufficiently like a wharf or pier to come within § 14. See *F. W. Fitch Co.* v. *United States*, 323

---

[1] Cases defining the word "vessel" in broader terms for other purposes have no application here. Cf. *Pleason* v. *Gulfport Shipbuilding Corp.* 221 F. 2d 621, 623 (5th Cir.); *United States* v. *Marthinson*, 58 Fed. 765, 766 (E. D. S. C.); *The Mary*, 123 Fed. 609, 612 (S. D. Ala.); *The Libby Maine*, 3 F. 2d 79, 80 (W. D. Wash. Anchored rafts held a "vessel" for purposes of a collision suit); *United States* v. *Yee Ngee How*, 105 F. Supp. 517, 522 (N. D. Calif.).

[2] Section 10 provides: "The department shall have general care and supervision of the harbors and tide waters within the commonwealth, of the flats and lands flowed thereby, . . . and of all structures therein, in order to prevent and remove unauthorized encroachments and causes of every kind which may . . . interfere with the navigation of such harbors, injure their channels or cause a reduction of their tide waters, and to protect and develop the rights and property of the commonwealth in such waters, flats and lands; and it may make such surveys, examinations and observations as it deems necessary therefor."

U. S. 582, 585–586. See also *Worcester* v. *New England Inst. & New England Sch. of Accounting, Inc.* 335 Mass. 486, 488–489. Cf. *Commissioner of Corps. & Taxn.* v. *Aetna Life Ins. Co.* 328 Mass. 404, 408.[1]

3. The harbor master was without power to remove the marina. Since no relief is sought by the department, which is not a party to either suit, we have no occasion to consider the extent of the department's powers. The exceptions are overruled. The interlocutory and final decrees are affirmed. Maxwell is to have costs of these appeals.

*So ordered.*

---

[1] Cases dealing with what would constitute a "structure" in other contexts would not necessarily control the interpretation of the word under § 14. Cf. *Inspector of Bldgs. of Falmouth* v. *General Outdoor Advertising Co. Inc.* 264 Mass. 85, 87–89; *United States* v. *Wilson,* 235 F. 2d 251, 253 (2d Cir.); *Healy* v. *Toles,* 266 Mich. 584, 587–588.