### NOTARY et al. v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit. December 17, 1926.)

No. 7335.

**1. Intoxicating liquors** ☞143—Maintaining place where customers habitually bring and consume their own liquor held "keeping of liquor for commercial purposes," and "nuisance" (National Prohibition Act, tit. 2, §§ 3, 21 [Comp. St. §§ 10138½aa, 10138½jj]).

Under National Prohibition Act, tit. 2, § 3 (Comp. St. § 10138½aa), maintaining for profit place where intoxicating liquor is habitually brought by others to be there possessed and consumed *held* to constitute "keeping of liquor for commercial purposes," and "nuisance," within section 21 (Comp. St. § 10138½jj), though proprietor does not own or sell liquor.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Keep; Nuisance.]

**2. Intoxicating liquors ⬳169—Employees of road house, endeavoring to prevent patrons from bringing and consuming liquor on premises, held innocent of violating liquor laws (National Prohibition Act, tit. 2, § 21 [Comp. St. § 10138½jj]).**

Employees of place to which intoxicating liquor is habitually brought by customers and consumed by them to proprietor's profit, who were not cognizant of proprietor's purpose, and personally endeavored to prevent bringing of liquor on premises, were not guilty of violating National Prohibition Act, tit. 2, § 21 (Comp. St. § 10138½jj); criminal intent being absent.

**3. Criminal law ⬳823(4)—Instruction that traffic in liquor on one's premises must be prevented at owner's peril held reversible error, not cured by subsequent qualification (National Prohibition Act, tit. 2, § 21 [Comp. St. § 10138½jj]).**

In prosecution for violating National Prohibition Act, tit. 2, § 21 (Comp. St. § 10138½jj), in permitting customers to bring and consume intoxicating liquor on premises, instruction that employees would be guilty, even if they used reasonable diligence to prevent violations of statute, and that one who knowingly permits liquor to be trafficked in on his premises must prevent it at his peril, *held* reversible error, not cured by subsequent statement that this does not apply to occasional violations.

**4. Criminal law ⬳810—Instruction that, though no liquor was kept, defendants were guilty if they maintained place where liquor was unlawfully kept, held erroneous (National Prohibition Act, tit. 2, § 21 [Comp. St. § 10138½jj]).**

Instruction that, though no liquor was sold nor kept on premises, defendants were guilty of violating National Prohibition Act, tit. 2, § 21 (Comp. St. § 10138½jj), if they maintained place where liquor was kept for unlawful purpose within statute, *held* conflicting and erroneous.

**5. Criminal law ⬳808—Practice of citing court decisions in instructions is disapproved.**

Practice of citing instances or decisions of courts in other cases to juries in connection with instructions is disapproved.

In Error to the District Court of the United States for the District of Colorado; J. Foster Symes, Judge.

Tony Notary and others were convicted of maintaining common nuisance, in violation of National Prohibition Act, and they bring error. Reversed and remanded for new trial.

S. Harrison White, of Denver, Colo. (Charles T. Mahoney, of Denver, Colo., on the brief), for plaintiffs in error.

Forrest C. Northcutt, Asst. U. S. Atty., of Denver, Colo. (George Stephan, U. S. Atty., of Denver, Colo., on the brief), for the United States.

Before KENYON, Circuit Judge, and SCOTT and JOHN B. SANBORN, District Judges.

SCOTT, District Judge. At the November, 1925, term of the District Court of the United States for the District of Colorado, Tony Notary, Nick Morrato, alias Nicholas Murato, Lucile Holzsweig, and Harvey R. Evans were presented by information signed by the United States attorney for that district, charging the said defendants with violation of section 21, title 2, of the Act of Congress approved October 28, 1919, known as the National Prohibition Act (Comp. St. § 10138½jj), in maintaining a common nuisance. No question is raised on the record as to the sufficiency of the information, and it may therefore be assumed to charge sufficiently a violation of the section referred to. The defendants each entered pleas of not guilty, and, upon trial to a jury, verdicts were returned in the case of not guilty as to the defendants Lucile Holzsweig and Harvey R. Evans, and guilty as charged as to the defendants Tony Notary and Nick Morrato. Judgment was entered on the verdicts sentencing defendant Tony Notary to confinement in the common jail of the city and county of Denver for a term of 11 months, and a fine of $500 imposed, and sentencing defendant Nick Morrato to confinement in the common jail of the city and county of Denver for a term of eight months, and a fine of $500 was imposed. Each of the defendants duly excepted, and have brought the case to this court upon writ of error.

Fifteen assignments of error were filed on December 28, 1925, and again on February 10, 1926, 17 assignments of error were filed. The second assignment appears to be little more than a repetition in somewhat more detail of the first assignment. Upon the brief the defendants by specification of errors relied upon have narrowed the controversy as here presented by selecting and classifying a portion of the original assignments, and on the argument the errors relied upon have been restricted to certain paragraphs of the court's charge only.

Preliminary to considering the paragraphs excepted to and assigned, a brief statement of the evidence will be proper. The evidence in the case tends to show that, some months prior to the occurrence in question, one Sam Holzsweig was operating the place on the outskirts of Denver, known as the Boulevard Café. The place was a species of roadhouse, and embraced a considerable inclosure where automobiles might be

driven in and parked, and a pavilion, including a kitchen and dance floor, with booths constructed around the outer edge containing tables. The activities were chiefly conducted during evenings and until the early hours of the morning. Sam Holzsweig died, and his wife, the defendant Lucile Holzsweig, succeeded to the property and the enterprise. After Sam Holzsweig's death, Lucile Holzsweig, under some arrangement with the defendants Evans, Notary and Morrato, reopened and continued to operate the place. Evans' duties seem to have been more particularly the tending of the soft drink bar. Morrato was denominated the door man and received the guests. Notary was designated as floor man, and his duties seem to have been directing guests and patrons to booths and tables, and seeing that they were seated and waited upon. Both the defendants Notary and Morrato seem to have had a supervisory relation to the concern. A liberal patronage seems to have been enjoyed, and nightly guests assembled for meals, dancing, and general enjoyment. It may be conceded, for the purposes of the discussion, that no intoxicating liquors were manufactured, sold, or bartered on the premises. Indeed, we think the record clearly tends to so show.

The evidence of the government tends to show, however, that the guests patronizing the place either habitually or frequently brought intoxicating liquors with them, and, after taking their places at the tables in the booths, publicly displayed intoxicating liquors in bottles on the tables and on the floor, and consumed them with their meals, or after their meals; that the waiters serving at the café, furnished glasses, ice, mineral water, ginger ale, and other soft drinks used in connection with the consumption of liquor; that somewhat unusual prices were charged for soft drinks and mineral water. To illustrate: $2 a bottle for ginger ale; $2 for mineral water. In other words, the theory and contention of the government is that this place was operated with the view of catering to the illicit liquor drinking public, and that, while the proprietors of the place neither sold nor bartered intoxicating liquors, nor kept any stock of the same on the place, still they designedly and habitually permitted their guests to bring their own intoxicating liquors to the place to be consumed in connection with the hospitalities of the place; that to that end they furnished the facilities for tippling with the intent and expectation that the guests would be attracted thereby, and not only generally increase their custom for legitimate entertainment, but would purchase ginger ale, mineral water, and other soft drinks at high and unusual prices, to be used in connection with their consumption of liquor; that in truth and in fact large numbers of patrons came to the place nightly, and remained until the small hours of the morning, for the purpose of consuming their intoxicating liquor in fancied security.

On the other hand, the defendants have offered testimony which, if believed, would tend to show that the proprietors of the place were forbidding the presence and use of intoxicating liquors on the premises, and that the defendants particularly habitually endeavored to enforce the rule of the place to prevent law violation in that respect on the premises. The evidence shows that agents in the service of the government, acting under the supervision and direction of the prohibition administration, had suspected the place and were using their faculties and energies to obtain proof of violations of the liquor law against the proprietors of the place and their attendants. In pursuance of the plans of the prohibition agents a so-called raid was planned and arranged for the night of July 11, 1925. Officers of the law assembled quietly and secretly, and apparently by suddenness took the place by storm. The booths were fairly well patronized, and were occupied by patrons. Some 17 or 18 bottles of liquor were captured on and about the premises.

Now, it is the contention and theory of the defendants that, inasmuch as the proprietors of the place in question neither manufactured, sold, nor bartered intoxicating liquors on the premises, and inasmuch as they kept no stock of liquors and supplied none to their patrons, that, first, the mere fact that patrons brought their own liquor upon the premises and there consumed it did not constitute a nuisance, under section 21 of the act referred to; and, second, that, even though it be conceded that such conditions might constitute a nuisance, nevertheless the defendants, being mere employés, would not be guilty, if in good faith they used reasonable diligence to prevent the bringing and using of liquor on the premises.

Consideration of the two propositions involved in these contentions render unnecessary noticing many of the errors assigned. Indeed, the argument on the briefs seems to be confined to these contentions, and criticisms of the instructions of the court are particularly directed to those portions of the

charge touching these propositions. Assignments of error 4 and 5, filed February 10, 1926, present the defendants' first contention sufficiently for the purposes of the discussion. They are as follows:

"(4) The court erred in overruling the objection of defendants that evidence as to liquor was incompetent, irrelevant, and immaterial, unless the liquor was obtained from or manufactured by defendants, or kept at the place for sale or barter, and in so doing declaring, in the presence of the jury, that 'the statute makes mere possession guilty of nuisance.'

"(5) The court erred in refusing, upon motion of defendants Notary and Morrato, at the conclusion of the evidence for the government, to instruct the jury to return a verdict of not guilty, and at the conclusion of all the evidence to give a like instruction, and in submitting the case to the jury."

In support of these assignments, counsel for plaintiffs in error cite Singer v. United States, 288 F. 695 (C. C. A. 3d Circuit); Street v. Lincoln Safe Deposit Co., 254 U. S. 88, 41 S. Ct. 31, 65 L. Ed. 151, 10 A. L. R. 1548; Feinberg v. United States, 2 F. (2d) 955 (C. C. A. 8th Circuit). Counsel for plaintiffs in error particularly stress the language of Mr. Justice Clarke in Street v. Lincoln Safe Deposit Co., supra, in which he says:

"Section 21 declares that 'any room, house, building, * * * or place where intoxicating liquor is manufactured, sold, kept, or bartered in violation of this title, and all intoxicating liquor and property kept and used in maintaining the same, is hereby declared to be a common nuisance,' and for the maintaining of such a place penalties are provided. The word 'kept,' in this section, is the only one of possible application to the case at bar, and the words with which it is immediately associated are such that as here used it plainly means kept for sale or barter or other commercial purpose. Its inapplicability to this case is apparent. 'Noscitur a sociis.' United States v. Louisville & Nashville R. R. Co., 236 U. S. 318, 334 [35 S. Ct. 363, 59 L. Ed. 598]."

[1] Now, as before stated, it may be conceded that no intoxicating liquors were manufactured, sold, or bartered on the premises in question. To narrow the discussion, it may be further conceded that no intoxicating liquors were kept for sale or barter on the premises. The question then remains: Were intoxicating liquors kept on the premises for other commercial purposes?

It will be observed that section 21, above quoted, was not intended, standing alone, to be self-sufficient. The language is not "manufactured, sold, kept or, bartered in violation of this" *section*, but in violation of this *title*. One is therefore, permitted to examine the entire title for prohibitions in connection with this language. Turning then to section 3 (Comp. St. § 10138½aa), we find that "no person shall on or after the date when the eighteenth amendment to the Constitution of the United States goes into effect, manufacture, sell, barter, transport, import, export, deliver, furnish or possess any intoxicating liquor except as authorized in this act, and all the provisions of this act shall be liberally construed to the end that the use of intoxicating liquor as a beverage may be prevented." The acts here prohibited are penalized in various subsequent sections of the act. It is therefore an offense against the laws of the United States to possess intoxicating liquor, except as authorized in the act.

Now, it will be further noticed that the prohibition of section 21 is specifically directed against the maintaining of the room, house, building, boat, vehicle, structure or place, but its effect is not limited to cases where the one maintaining the place personally does the manufacturing, selling, keeping or bartering. The question then arises, If one maintains a building or place where intoxicating liquor is habitually brought by others to be there possessed and consumed for beverage purposes, and maintains such place and there permits such possession of intoxicating liquor for profit, does he thereby constitute his place a nuisance under the provisions of section 21?

We have no hesitation in answering this question in the affirmative. We think that, where one maintains a place such as the one here in question, he is engaged in commerce; and if he purposely, and catering to the patronage of the illicit liquor drinking public, permits his patrons to bring intoxicating liquor upon the premises, and there possess it and consume it, and all this to increase the profits of his business, that he is maintaining a place where intoxicating liquor is kept in violation of law. We think the liquor is kept on the place for a commercial purpose when it is permitted to be kept there for a commercial purpose, even though the keeper of the place may not own the liquor. In the given case the keeper's motive and purpose was a commercial one. He kept the place and permitted the unlawful possession of intoxicating liquor therein for profit.

[2] Coming now to the second contention:

Would it be material, in the case of attendants and employés of such a place, if they were not cognizant of the purpose of the proprietor, and personally used their efforts to prevent the bringing of liquor on the premises, and its possession there in violation of law? We think the mere statement of this question suggests its answer. There can be no crime of this character without a criminal intent.

[3] One of the paragraphs of the charge of the court, excepted to and assigned as error, relates to the contention of the defendants that it was a part of their duty and that they did use reasonable diligence to prevent the bringing of liquor and the possessing of it on the premises. In that connection the court said:

"Now, the question whether they used reasonable diligence to prevent it does not make any difference. It is no excuse for a violation of law that they tried to prevent it. A man who permits liquor to be trafficked in on his premises, if he knows what is going on, has to prevent it at his peril."

We think this statement on the part of the court was clearly reversible error. True, the court followed this by saying:

"That does not mean he is guilty for an occasional violation of the law, but it if occurs oftener, as a regular thing, on his premises, and there is an invitation in any way held out to the public that they can come there, and did come there in numbers, and violate the law, that is some evidence for you to consider as to whether he made reasonable efforts to prevent it or not."

We do not think this uncertain language following in any way cured the specific and unqualified erroneous statement of the rule. The subsequent statement, "That does not mean he is guilty for an occasional violation of the law," is in itself, we think, confusing.

[4] In another paragraph of the charge, excepted to and assigned as error, the court said:

"Now, as I have said before, no liquor was sold, no liquor was kept, on these premises. So the sole question for you to decide is whether, first, these defendants maintained a place where liquor was kept for an unlawful purpose, as the statute defines it (and any customer who brought liquor in there and drank it on the premises was committing an unlawful act); and, secondly, whether either of these defendants actively within the meaning of that statute directed, aided and abetted or counseled or induced them to violate the law. If they did, they are guilty. If they did not, they are not guilty."

It may be that in the use of the word "kept" the court spoke inadvertently. Indeed, we are inclined to think that the court intended to use the word "manufactured" in that connection, but the statement as it was given to the jury is conflicting and very confusing. We think as given the statement was erroneous.

[5] That part of the court's charge wherein the court attempted to explain to the jury the meaning of nuisance is assigned as error. The court said:

"Now, the courts have construed this statute on various occasions. For instance, one court has said that the possession of liquor by one maintaining a saloon is made prima facie evidence that such liquor is kept for the purposes constituting the premises as a nuisance under section 21, and that a single sale or brief possession, when accompanied by facts showing that the place where the sale was made or the possession had was maintained for keeping or selling intoxicating liquor, is sufficient to sustain the charge of maintaining a statutory nuisance. Another case has held that the fact of unlawful possession within the prohibition of the statute constitutes the offense, and that offense may obviously be committed on one day as well as on two or more days. In other words, gentlemen, one single keeping of liquor for sale or illicit commercial or unlawful purposes is sufficient in this case to establish the charge brought by the government, if you find beyond a reasonable doubt that such an act occurred on the premises at any of the times the government witnesses have testified to. The test is not the number of offenses or the length of time liquor is unlawfully kept on the premises, but whether the place was maintained for the unlawful keeping or bartering of liquor in the sense those words are used in the statute, bartering or keeping of liquor for unlawful purposes being the acts that constitute the offense."

The practice has often been condemned of citing instances or decisions of courts in other cases to juries in connection with instructions. It almost invariably leads, as in the present case, to an argumentative instruction. While in this case the instruction may not have been prejudicial, we deem it proper to make pronouncement of our disapproval of the practice.

A number of other assignments are argued, but we think in their last analysis they are answered by what has already been said. For the errors above noticed, the case will be reversed and remanded for a new trial.

Reversed.