Lawrence **BERNARDO**, Plaintiff-
Appellant,
v.
**BETHLEHEM STEEL COMPANY**,
Defendant-Appellee.
No. 202, Docket 27619.

United States Court of Appeals
Second Circuit.

Argued Jan. 18, 1963.

Decided March 7, 1963.

Jacob Rassner, New York City, for plaintiff-appellant.

Frank A. Bull, New York City (Daniel Huttenbrauck and Mendes & Mount, New York City on the brief), for defendant-appellee.

Before MEDINA, WATERMAN and MOORE, Circuit Judges.

MEDINA, Circuit Judge.

On April 19, 1956 Lawrence Bernardo, a shore-based welder in the employ of Bethlehem Steel Company, was injured when he fell from a scaffold on a floating drydock in a slip of Bethlehem's 27th Street shipyard in Brooklyn, New York. In this action against Bethlehem, Bernardo alleged claims under the Jones Act, 46 U.S.C. § 688, and the general maritime law; and, as the Longshoremen's and Harbor Workers' Compensation Act of March 4, 1927, 44 Stat. 1424, 33 U.S.C. § 901 et seq. restricts the benefits of the Jones Act to "members of the crew of a vessel plying in navigable waters," Swanson v. Marra Bros., Inc., 1946, 328 U.S. 1, 7, 66 S.Ct. 869, 90 L.Ed. 1045, and as Bernardo's claim under the general maritime law could succeed only if he was at the time he received his injuries a member of the crew of a vessel, the trial judge at the ensuing jury trial decided to sever the issues under Rule 42(b) of the Federal Rules of Civil Procedure, and first try out and submit to the jury the issues involved in the following two questions:

"First: Was floating drydock No. 3, owned by the defendant, Bethlehem Steel Company, a vessel engaged in navigation in navigable waters or on navigable waters?

"Second: Was the plaintiff, Lawrence Bernardo, a member of a crew on floating drydock No. 3 on April 19, 1956?"

From the outset Bethlehem took the position that as matter of law the floating drydock was not a "vessel," and that Bernardo was not a "member of the crew" of the drydock. Bernardo's position, both at pre-trial motions and at

the trial itself, was that the issues were issues of fact for determination by the jury. At the close of the evidence the trial judge reserved decision on Bethlehem's motion to dismiss and submitted the two questions to the jury, who answered both questions in the negative. There was, accordingly, no occasion to proceed further with the trial, the complaint was dismissed, and Bernardo appealed.[1] The opinion below is reported at 200 F.Supp. 534.

When the case was called for oral argument Jacob Rassner, Esq., counsel for Bernardo, informed this Court that he thought many of the points discussed in appellant's brief were without merit, that he desired to withdraw the brief and present as a basis for reversal of the judgment the following: (1) that the floating drydock, in the light of the evidence adduced at the trial, was as matter of law a "vessel" and that, also as matter of law, Bernardo was a "member of the crew" of that "vessel"; (2) the instructions to the jury were so incorrect and inadequate that, even in the absence of specific objection or exception, this Court should take note of the error and order a new trial in the exercise of its inherent powers to prevent a miscarriage of justice; and (3) it was error to refuse appellant's Request No. 19 "in the language requested * * * other than as covered in the general charge."

It was then stipulated by the parties in open court that appellant would rely solely upon the points above enumerated and we ordered new briefs filed on that basis. At the request of counsel for both parties the case was then argued and the new briefs filed in due course, as directed. Accordingly, after hearing argument and studying the new briefs, we have considered only the above-mentioned points.

Bernardo testified he had worked for Bethlehem about 14 years on a nightly "shape up" basis; that he was a member of a maritime union; that on April 19, 1956 he was assigned to work welding a vertical crack in a seam on the steel wall of the drydock and that he fell from a scaffold as he was doing this welding. He said the drydock had previously been "tied up" at Pier No. 3, but some three months prior to the accident had been towed around in sections by tug to the slip where it was when he was injured. While he admitted working on other drydocks and various ships during the six months prior to his fall, he estimated that most of the time he was working on Drydock No. 3. "They always kept me moving around on the drydocks, working on the ships." The repairs consisted of removing the wooden wings and replacing them with steel. He did not remember signing any ship's articles as a seaman, and lived on shore with his mother.

Frank Albino, who worked in the plate shop in the 27th Street Yard, alongside the slip where Drydock No. 3 was floating when Bernardo was hurt, testified that due to an accident at Pier 3 ("A ship was on there and the wings broke") Drydock No. 3 was moved to the slip and new wings put on. He said the new steel wings "were already up" when Bernardo was hurt, and that "evidently" some time later Drydock No. 3 was towed back to Pier 3, its regular berth. Except for the steel wings and new pumps he could not recall any other changes from the time it was taken from the slip and brought back to its berth at Pier No. 3.

Captain Edward L. Hays was Bernardo's principal witness and he testified as an expert. Relying on his experience in the Pacific after the close of World War II he said the drydock could be towed at sea, and he made various comparisons between a drydock and scows, dredges, floating cranes, and barges. He also explained how modern drydocks perform their functions, said the United States Navy classified floating drydocks as vessels, expressed the opinion that everyone working on a drydock, including welders

---

1. On this appeal Bernardo does not challenge the ruling of the trial judge in dismissing an additional claim based upon Section 240 of the New York Labor Law, McKinney's Consol.Laws, c. 31, as barred by Section 11 of the New York Workmen's Compensation Law, McKinney's Consol.Laws, c. 67.

engaged in the repairing of seams, was a member of the crew of the drydock and that if a welder worked on a number of different drydocks "he is a member of the crew of the one that he is working on for the moment." In answer to a hypothetical question based upon Bernardo's testimony, he stated his opinion to the effect that Drydock No. 3 at the time of the accident was a vessel in navigation and that Bernardo was a member of the crew of that vessel. He also testified that he had seen members of the crew of vessels doing welding while the vessels were on the high seas, and that ship's papers were not customary or necessary except for foreign service. The following questions and answers are part of the testimony of Captain Hays:

"Q. Did you say that there was a continual operation there that required a crew? A. I am sorry, I don't understand what you mean by 'continual operation'—of what?

"Q. That is what I am trying to find out what you meant. You said they are required to have a crew there for continuous operation, and I asked you why. A. Yes. If I understand what you are referring to properly, what I meant by 'continuous operation' was that when the dry dock is in service, that a crew must be maintained—must be available and employed to keep it in operation."

Part of the pre-trial deposition of Anton Pettersen, a Bethlehem superintendent, was read to the effect that members of the crew of a vessel at sea sometimes do repair work such as caulking loose rivets.

Bethlehem's principal witness, G. Stuart Enscoe, the plant engineer in charge of maintenance and repair at the shipyard, described Drydock No. 3 in normal operation and the making of extensive repairs by way of reconstruction that were not yet completed at the time of Bernardo's fall. Drydock No. 3 was somewhat larger than a football field, of 14,000 tons capacity, with no motive power and its motors were designed solely for the purpose of operating the pumps which raised and lowered ships undergoing repairs. For some years prior to 1955 it was berthed in the Gowanus Canal in the Port of New York on the North side of Pier No. 3, to which it was permanently connected by a series of welded spuds and clamps, so it could only be moved up and down. He said it had no crew and it had never been used to transport any cargo or anything else. In 1955 when Drydock No. 3 contained a badly damaged ship there was a serious accident causing extensive damage to the wooden wings and the pontoons. It was decided to make repairs that amounted practically to the reconstruction of the drydock. The job lasted "for a period of over a year."

In order to complete these repairs or reconstruction the welded spuds and clamps were removed, the six sections of the drydock were separated and towed by tug into the outer basin of the shipyard. After the pontoons had been repaired, new foundations built, and the new steel wings constructed, the sections were taken to the inner basin and put together. When Bernardo was hurt the job was not yet completed and they were "cleaning up the miscellaneous welding that was left."

During the work of reconstruction and as needed Enscoe requisitioned "carpenters, electricians, machinists, welders and so forth" from the foreman of the shop of the particular trade. Sometimes the men were working on ships and sometimes on drydocks. During the period of reconstruction the drydock was not put to any use whatever.

After the accident the reconstruction job was completed and Drydock No. 3 was pushed and towed by tugs, turned around and returned to its permanent berth at Pier 3, with new welded spuds and clamps.

There was further testimony giving details of the work of reconstruction and to the general effect that this work was completed in the summer of 1956. Bernardo's time records show that he work-

ed 18 days in January, 19 days in February, 26 days in March, and 14 days in April, including April 19, and that of this his work on Drydock No. 3 covered 12, 16, 2 and 3 days respectively. The details of his work other than on Drydock No. 3 do not appear on these records.

## I

On this record it is clear to us that there was no basis for a ruling by the trial judge as matter of law that at the time of injury Drydock No. 3 was a "vessel in navigation" and Bernardo was a "member of the crew." Nor are we called upon to rule one way or the other on Bethlehem's contention that Drydock No. 3 was as matter of law not a "vessel in navigation" and Bernardo not a "member of the crew." See Hill v. Diamond, 4 Cir., 1962, 311 F.2d 789.

The proper course for a trial judge in these Jones Act cases is to do precisely what Judge Croake did here, submit the issues of fact to the jury and rule later on issues of law in the event that it becomes necessary to do so. In this way the whole case is in proper shape for review on appeal, without the necessity of another trial, in the absence of prejudicial rulings on matters of evidence or in the instructions to the jury.

Where, as here, the basic issues have been determined by the trier of the facts, whether by judge or jury as the case may be, the findings must be sustained on appeal unless "clearly erroneous," or if there is a "reasonable basis" to support them. Senko v. LaCrosse Dredging Corp., 1957, 352 U.S. 370, 374, 77 S.Ct. 415, 1 L.Ed.2d 404; Grimes v. Raymond Concrete Pile Co., 1958, 356

U.S. 252, 78 S.Ct. 687, 2 L.Ed.2d 737; Butler v. Whiteman, 1958, 356 U.S. 271, 78 S.Ct. 734, 2 L.Ed.2d 754; Weiss v. Central R. R. Co. of N. J., 2 Cir., 1956, 235 F.2d 309, 311; McKie v. Diamond Marine Co., 5 Cir., 1953, 204 F.2d 132, 136.[2]

In the case before us the evidence was conflicting in many respects, there were issues of credibility concerning both Bernardo and his expert Captain Hays, and all inferences to be drawn from the basic facts were also for the jury. Thus it is apparent that while the drydock floated and performed "special purpose" functions related to maritime activities, and even assuming placing the drydock in the slip for repairs did not deprive it of any status as a "vessel," the evidence as to the mode of attachment when in use, the lack of motive power, and the absence of transportation or navigation features in its operation supports the determination that even when in use at Pier No. 3 it was not a "vessel." So too, the evidence as to Bernardo's eating and sleeping at home, his working an eight-hour day on a daily assignment basis, and the amount of time spent by him in connection with Drydock No. 3 and other drydocks would support a jury finding that he was not permanently enough attached to Drydock No. 3 to be considered a member of its crew at the time of his injury. The evidence would also seem reasonably to support the inference that the drydock was not "in navigation" at the time of the injury. The claim that the issues framed in the two questions should have been decided in Bernardo's favor as matter of law seems too farfetched to be taken seriously, and we reject it.[3]

2. We find nothing to the contrary in Long Island R. Co. v. Lowe, 2 Cir., 1944, 145 F.2d 516, where the finding by the Deputy Commissioner, under the Longshoremen's and Harbor Workers' Compensation Act, supra, to the effect that the decedent was not a "seaman" was found to be without reasonable evidentiary support.

3. Norton v. Warner Co., 1944, 321 U.S. 565, 571–573, 64 S.Ct. 747, 88 L.Ed. 430; Weiss v. Central R. R. Co., of N. J.,

supra; Carumbo v. Cape Cod S.S. Co., 1 Cir., 1941, 123 F.2d 991, 995; McKie v. Diamond Marine Co., supra, 204 F. 2d at 135–136; Wilkes v. Mississippi River Sand & Gravel Co., 6 Cir., 1953, 202 F.2d 383, 388, cert. denied, 346 U.S. 817, 74 S.Ct. 29, 98 L.Ed. 34; Kibadeaux v. Standard Dredging Co., 5 Cir., 1936, 81 F.2d 670, 673, cert. denied, 299 U.S. 549, 57 S.Ct. 12, 81 L.Ed. 404; Jeffrey v. Henderson Bros., 4 Cir., 1951, 193 F. 2d 589, 591–592.

## II

Request to charge No. 19 is as follows:

"19. The law has held that a man may be regarded as a member of the crew of a vessel even though he 'was employed aboard ship for only a short period of time; that during that period he slept and ate most of his meals ashore; that he was paid an hourly wage and worked for the most part an eight-hour day; that he was employed for part of the time on jobs ashore; that he was working on an extra man rather than on a regular basis and that he had no seaman's papers.' "

This was refused in the language submitted and except as covered by the main charge.

█ It would suffice to say that the request is argumentative and in some respects inaccurate. Ayers v. Watson, 1891, 137 U.S. 584, 600–602, 11 S.Ct. 201, 34 L.Ed. 803; Alexander v. Kramer Bros. Freight Lines, Inc., 2 Cir., 1959, 273 F.2d 373, 375. Further comment is desirable, however, as courts have repeatedly warned against the use of quotations from opinions of appellate courts, taken out of context and never intended as instructions to juries. Pointer v. United States, 1894, 151 U.S. 396, 416–417, 14 S.Ct. 410, 38 L.Ed. 208; Lisansky v. United States, 4 Cir., 1929, 31 F.2d 846, 852, 67 A.L.R. 67, cert. denied, 279 U.S. 873, 49 S.Ct. 514, 73 L.Ed. 1008; see 1 Branson, Instructions to Juries, § 102 (3rd ed. by Reid); 53 Am.Jur., Trial, § 543 (1945); cf. Notary v. United States, 8 Cir., 1926, 16 F.2d 434, 438.

The extent to which this particular request is misleading is apparent when read in context. It is a partial quotation from the opinion of Judge Clark in Weiss v. Central R. R. Co. of N. J., supra. What Judge Clark wrote, at pages 311–312 of 235 F.2d, is as follows:

"Weighing against plaintiff's claim are the factors that he was employed aboard ship for only a short period of time; that during that period he slept and ate most of his meals ashore; that he was paid an hourly wage and worked for the most part an 8-hour day; that he was employed for part of the time on jobs ashore; that he was working on an 'extra man,' rather than on a regular, basis; and that he had no seaman's papers. Various of these factors have been singled out for expression in decisions which have held claimants not to occupy a seaman's status. (citations) But while these factors deserve consideration they are by no means conclusive, or even perhaps realistically compelling, as other cases have made clear. (citations)

So here, where the vessels in question were, during the time of plaintiff's employment aboard them, engaged in continuous navigation involving the carriage of passengers and vehicles across the Hudson River and where plaintiff himself was at the wheel of one ferryboat, the Wilkes-Barre, for considerable periods of time, we think the factors named inadequate to require a finding of only land employment as a matter of law."

It is not disputed that the instructions as a whole included all the evidentiary matters contained in Request No. 19, and the trial judge repeatedly told the jury to consider all the evidence in coming to a conclusion on the facts and answering the two questions submitted to it. What Bernardo's counsel was trying to obtain was a species of repetition by the trial judge of part of his own summation, and this was very properly refused.

## III

█ As no specific objections were made to any part of the main charge, Bernardo now claims the instructions were so generally erroneous and inadequate as to require that we direct a new trial in the exercise of our plenary power to prevent a miscarriage of justice. To support this contention counsel for Ber-

610

nardo, in his supplemental brief, describes the instructions to the jury thus:

> "The charge was such as to leave the indelible impression that the appellant had the burden of proving that the vessel had to be of the classic type sailing navigable waters, and that the appellant had to be a sailor in the lay concept of the term."

This extravagant characterization is wholly unwarranted. We have carefully studied the instructions in their entirety and find that they fairly, accurately and thoroughly stated the existing law as reflected in the decided cases. The trial judge expressly stated, "it is not necessary for a vessel to be the classic type of ship or boat to be considered a vessel. A vessel may be a special purpose craft which is unlike the normal boat but is still capable of navigation." Again: "[T]he fact that Bernardo did not perform tasks regularly associated with the navigation or sailing of a ship does not preclude him from being a member of the crew." As we have already noted, the trial judge repeatedly admonished the jury that they should consider all the testimony bearing on the issues and that "no one factor alone is determinative."

The real cause of Bernardo's complaint seems to be that he expected to receive a favorable verdict and is surprised and disappointed at the outcome. But basic concepts of evenhanded justice suggest that a plaintiff may occasionally lose. See Adams v. Kelly Drilling Co., 5 Cir., 1960, 273 F.2d 887, cert. denied, 364 U.S. 845, 81 S.Ct. 86, 5 L.Ed.2d 68. If on facts more or less resembling those in this case appellate courts have affirmed findings favorable to plaintiffs because there was a "reasonable basis" in the evidence to support them, it is to be expected that in similar fashion they will affirm findings unfavorable to plaintiffs when there is a "reasonable basis" in the evidence to support such findings. That is all there is to this case. As said by Mr. Justice Reed, speaking for the Court in Senko v. LaCrosse Dredging Corp., supra, 352 U.S. at 374, 77 S.Ct. at 417: "The essence of this discretion is that

a jury's decision is final if it has a reasonable basis, whether or not the appellate court agrees with the jury's estimate."

Affirmed.