---

THE MARY.

(District Court, S. D. Alabama. June 10, 1903.)

No. 1,002.

1. SHIPPING—DESTRUCTION OF RAFT—OBSTRUCTION TO NAVIGATION.

A log raft is a vessel, and entitled to the same rights in navigable streams as other vessels. If such a raft accidentally becomes grounded, or otherwise obstructs navigation, other vessels are required to submit to a reasonable delay until the owner has had time to remove it, in the exercise of proper skill and reasonable diligence and dispatch, before they are entitled to destroy it as a nuisance.

2. SAME.

A raft of logs became lodged against a bridge across a river, so as to entirely obstruct the passage of other vessels, and a steamer passing down the river ran over the center of it, breaking it up and scattering the logs, some of which were lost. Held, that the steamer was liable for the loss, whether or not those in charge of the raft were negligent in failing to exercise proper skill and diligence to remove the obstruction, because of her failure to use reasonable and ordinary care to prevent unnecessary injury, which she might have done by towing the raft out of the way, or, at least, by cutting it, so as to prevent the loss of the logs.

3. SAME—EVIDENCE—JUDICIAL NOTICE.

A federal court in Alabama cannot take judicial notice of what constitutes a "sack raft," and that a particular raft is such a raft and unlaw-

123 F.—39 ·

ful, where the testimony shows that there is no such thing as a sack raft commonly known within its jurisdiction, there being no law of the United States or of the state describing such a raft.

In Admiralty. Suit in rem for damages for the destruction of a raft of logs.

Gregory L. & H. T. Smith, for libelant.

Pillans, Hanaw & Pillans, for claimant.

TOULMIN, District Judge. This is a suit by the owner of a raft of pine logs to recover damages for running over and breaking up a raft by the steamboat Mary in navigating the Mobile river. The facts, as shown by the evidence, are substantially as follows: In August, 1902, the libelant had a raft of logs being floated from McIntosh Bluff, 65 miles from the city of Mobile, to said city. When near the Louisville & Nashville Railroad drawbridge, over Mobile river, the raft became unmanageable by reason of a sudden adverse wind (as testified to by the men navigating the raft), got athwart the river, and floated down broadside against the bridge; one end of the raft lodging on one bank of the river, and the other end on some driftwood near the other bank, thus completely blocking the channel and preventing the passage of vessels through the draw of the bridge. The raft had been in this position for several hours when the Mary came down the river, on her way to the city of Mobile, with a large number of passengers, a cargo aboard, and a barge in tow. In the meantime the men in charge of the raft had made some effort to get it adrift and away from the bridge, and called to their assistance a nearby tug, which fastened a line to one end of the raft and made a short and ineffectual effort to remove it. The tug then left the raft and went on its way. As the Mary approached near the raft, her master called to the men on it, saying something to them about the raft being in his way. They made no reply to him. They testified that they did not hear the call. The Mary approached the raft, touched it with her prow once or twice, and backed off a short distance, then came ahead again, and ran over it, and through the open draw span of the bridge, breaking the raft, and scattering many of the logs, some of which were subsequently rescued. The men on the raft were near its end, and not near that part of it struck by the Mary. The master of the Mary testified that, when he first came up to the raft, he thought he would "hitch onto it and pull it out of the way"; but when he called to the men on it, and received no answer, and seeing no effort being made by them to get the raft out of the way, he "got mad," and determined to run over it and go through the bridge. The raft was estimated to be about 800 feet long, 75 feet wide at its widest part, and to contain about 1,400 logs. It was what was described and known by the mill and raft men (a number of whom testified in the case) as a "V raft." It was constructed by placing 6 or 7 logs at each end of the raft, and fastening them together with wooden binders and pins, which binders extended to the boom logs on the outside of the 6 or 7 logs mentioned, and were made fast to them. To these boom logs other boom logs were fastened at their ends, by lapping and securely pinning or tying

them together, and so on extending from the head to the rear of the raft. Inclosed in these boom logs were loose logs, put in fore and aft. There were several ropes fastened at different places across the raft to the boom logs on the outside. The raft widened from each end to the center. On each end was a "sweep," in the nature of an oar, which was used for steering and managing the raft in its navigation. It was shown that rafts of this construction were rigid —not liable to spread or bulge. There were only two men on the raft, which was shown to have been an unusually large one in these waters; but it was also shown that it was constructed in the customary manner of rafts floated down the rivers to the Mobile market, and that in the then stage of the water, and under ordinary conditions, two men were sufficient to navigate and manage such a raft. There was also evidence of the construction and character of what is known as a "sack raft." Some of the witnesses, called to testify on the subject, knew nothing about sack rafts in this section of the country. They stated that such rafts were not generally used or known here. Witnesses who formerly lived in some of the Northern or Western states of the Union testified that sack rafts were well known there. They testified to the description of such rafts, as they knew them, and pointed out material differences between them and rafts like the one involved in this case. They described sack rafts as being round, or nearly so, in shape, the outside or boom logs fastened together at their ends with chains or ropes in a loose manner, with considerable slack. Inclosed in these boom logs are loose logs, put in without regard to position or order, with no binders of any sort, no propelling or steering power, and no arrangement or facilities for carrying men on them. They are usually towed by a steam vessel. When the tow line is made fast, and the towboat begins to pull on it, the raft becomes more or less elongated, and takes somewhat the shape of a sack or bag. If left to float with the current, they drift with a rotary motion—as described by the witness, "go around and around," with no definite or direct course, and are dangerous to navigation.

The contention on the part of the libelant is (1) that its conduct in permitting the river to become obstructed at the bridge by its raft was not negligent or otherwise wrongful, but was accidental, and that it was a temporary, and not an unreasonable, obstruction, and was not a nuisance; and (2) if it was a nuisance, and the Mary had the right to abate or remove it in order to effect a passage through the bridge, yet in exercising that right it was her duty to use ordinary care to do no unnecessary injury to the raft, and that running upon the raft and breaking it up was intentional and unnecessary. The contention of the claimant is that libelant's raft was an unlawful one, being what is known as a sack raft, and that it was navigated in such a manner as to obstruct navigation; that the libelant, in obstructing or impeding the Mary's passage through the drawbridge, became a wrongdoer, and created a nuisance, which the Mary had the right to remove; and that in exercising that right it resorted to such means only as were necessary and available. The claimant also objected to the evidence as to what was known as a "sack raft," and of a description of it, and con-

tended that the court took judicial notice or knowledge of what a sack raft was.

"Navigable streams are as much dedicated to the use of rafts as to the use of other vessels. Rafts are included in the general term 'vessels.' If the privilege of use be abused, the persons so abusing the use are liable civilly for any · damages they may occasion." The Marthison (D. C.) 58 Fed. 765; 19 Am. & Eng. Encyc. (2d Ed.) 524; 21 Am. & Eng. Encyc. (2d Ed.) 439. The occasional grounding of a vessel or raft is incidental to navigation, and, if it is driven into a position where it obstructs the channel, other navigators are bound to submit to a reasonable delay, in order that the owner may remove it, before attempting to destroy it as a nuisance. But the owner of the vessel or raft so obstructing the channel must exercise all proper skill and reasonable diligence and dispatch to remove the obstruction and cause as little inconvenience as possible to others. Gould on Waters, §§ 29, 128. It does not appear from the evidence that the raft grounded and came in contact with the railroad bridge, and thereby obstructed the channel, from any fault of the libelant. But, assuming that those in charge of the raft did not exercise proper skill and reasonable diligence and dispatch to remove the obstruction, and the raft thereby became a nuisance which the Mary had a right, for its protection, to remove, did the Mary, in exercising that right, use ordinary care to do no unnecessary injury to the raft? In abating the so-called nuisance, did she inflict as little injury as possible? Mark v. Hudson R. Bridge Co., 103 N. Y. 28, 8 N. E. 243; Gates v. Blincoe, 26 Am. Dec. 443, 444, and authorities cited in note. I think that the master of the Mary, in removing the obstruction to effect a passage through the bridge, failed to use ordinary care to do no unnecessary injury to the raft. It seems to me, from the evidence in the case, that he could have effected less injury to it than actually occurred. I think there were two ways for him to have done this. He could have fastened a line to the raft, and pulled it away from that part of the bridge through which passage was obstructed; or, if he failed to accomplish this, he could have cut the raft open and removed it sufficiently to get through. Either course appears to me to have been practicable, and would have entailed less injury than the course pursued. The men on the raft were at hand with the means and appliances to · catch and secure any logs that might have gotten out of the raft by cutting and opening it. The master of the Mary in his testimony stated that he at first thought he would put a line on the raft and pull it out of the way, but, when he got no answer to his call to the men on the raft, "he got mad" and determined to run over it.

In answer to the contention of claimant that the court will take judicial knowledge of what a sack raft is, that the raft involved in this case was a sack raft, and that a sack raft is an unlawful raft, I will say that, while courts do take judicial notice of matters of public notoriety and general information, such as public laws, historical events, the constitution and course of nature, main geographical features, and the like, and will generally take notice of whatever ought to be generally known within their jurisdiction, this court has not the judicial knowledge claimed for it in this instance, first, because there is no law of the

United States or of this state defining or describing a "sack raft," so far as I am advised; second, because the evidence in this case shows that there is no such thing as a "sack raft" commonly known in this jurisdiction; third, because the witnesses who claimed to know what a "sack raft" is testified as to its construction, and showed that it was in several material respects unlike the raft in question in this case, and that this raft was not a "sack raft"; and, fourth, because a sack raft is not declared to be unlawful by any act of Congress or law of this state. Act Cong. March 3, 1899, c. 425, 30 Stat. 1151 [U. S. Comp. St. 1901, p. 3540], provides that it shall not be lawful to float loose logs and timber, and what is known as sack rafts, in such manner as to obstruct or impede navigation; and Act May 9, 1900, c. 387, 31 Stat. 172 [U. S. Comp. St. 1901, p. 3548], provides that Act March 3, 1899, shall not be applicable to those streams where the floating of timber, logs, and sack rafts (so called) is the principal method of navigation, and authorizes the Secretary of War to prescribe rules and regulations for floating loose timber, logs, and sack rafts (so called) in those streams. My opinion is that these acts of Congress have no application to this case.

The counsel for the claimant has cited the case of The Athabasca, 45 Fed. 651, from the District Court of Michigan, as defining or describing a sack raft, and on the proposition that the court took judicial notice of it, as I understood the contention. On an examination of the opinion in that case, I do not find the term "sack raft" used, or that the raft which was described was held to be unlawful. But I find that the court got the description, and presumably the name, from the evidence in the case. I quote from the opinion the following:

"The facts in the present case, as I collect them from the evidence, are that the libelant, having constructed a raft of logs at the foot of the Sault Ste. Marie, undertook to float and tow it down the river into Lake Michigan. The raft was about 1,200 feet long and 250 feet wide, and was inclosed in a sack boom; the logs lying crowded together in the boom, unfastened, except as they were surrounded and kept together by the boom. The latter consisted of long, stout, heavy timbers, strongly fastened together with chains. Across the body of the raft at different places were thrown two or three guys or cables, fastened to the sides, intended to keep the raft from spreading. There were two tugs in charge of her, one at the head and the other at the rear. The purpose of the tugs was to help the raft along, and to pull and crowd it over to one side of the channel, in order to let vessels going up and down pass by, and otherwise keep it clear of collisions. Thus equipped the libelant started down the river with the raft. * * * About the time the raft entered the narrows, the Athabasca was coming up around a point, and had not yet seen the raft. She was signaled by one of the tugs in charge of the raft to check her speed, which she did, and proceeded along slowly as near the opposite shore as it was prudent to do. The raft was passing down with full rate of the current, the tugs at either end trying to pull and crowd the raft over to the other shore far enough to give room to the approaching vessel. The effect of this was to carry over the ends, leaving a large swell or bulge in the middle. * * * The swiftness of the current, the great weight and momentum of the raft, and its loose pouching structure, rendered it impossible for the tugs to make any considerable impression on its course at that point. The Athabasca, not daring to go so far shoreward as to escape, as she approached the raft, collided with and broke it."

The learned judge said:

"In my opinion, it was a hazardous undertaking on the part of the libelant to attempt to take a raft of the size, form, and structure of this one down

the river Ste. Marie, knowing the perils which were likely to arise from the almost constant passing of vessels, the swiftness of the current, and its occasionally narrow channels. It was an added negligence in the libelant that it did not take effective measures to warn the Athabasca before she came into the straits. Especially is this so because the approach of the vessel was known. The improvidence of the undertaking to move such a raft through this river, with the added failure to give proper notice to the Athabasca of the coming of the raft through the narrow portion of the channel, constituted the negligence to which the collision is attributable."

The libel in that case was dismissed. In my opinion, the libelant in this case is entitled to a decree, and a reference to ascertain the amount of its damages; and it is so ordered.