UNITED STATES of America,
Appellee,

v.

MORAN TOWING & TRANSPORTA-
TION COMPANY, Incorporated,
Appellant.

UNITED STATES of America,
Appellee,

v.

BETHLEHEM STEEL COMPANY,
Appellant.

Nos. 9867, 9868.

United States Court of Appeals
Fourth Circuit.

Argued May 5, 1965.

Decided Feb. 10, 1967.

Sobeloff, Circuit Judge, dissented.

David R. Owen, Baltimore, Md. (William R. Dorsey, III, and Semmes, Bowen & Semmes, Baltimore, Md., on brief), for appellant in No. 9868.

Southgate L. Morison, Baltimore, Md. (Ober, Williams & Grimes, Baltimore, Md., on brief), for appellant in No. 9867.

Martin Jacobs, Atty., Department of Justice (John W. Douglas, Asst. Atty. Gen., and Alan S. Rosenthal, Atty., Department of Justice, on brief), for appellee.

Before HAYNSWORTH, Chief Judge, and SOBELOFF and BOREMAN, Circuit Judges.

HAYNSWORTH, Chief Judge.

The controversy involves the duty and financial burden of removal of the broken hulk of what once was a floating dry

dock. The United States contends that the financial burden rests upon Bethlehem Steel Company, the owner, and Moran Towing & Transportation Company, Incorporated whose tugs had the dock in tow, because, under the relevant statutes, the dry dock was not a vessel or craft, and, even if it was, that the burden is cast upon the owner and the tug owner, because the dry dock was intentionally grounded, as the District Court found, or, at least, the grounding occurred as a result of negligence. The defendants, on the other hand, contend that the floating dry dock was a vessel or craft within the meaning of the relevant statutes, that the grounding was not intentional or even the result of negligence, but, that if there were fault on their part, the owner's abandonment casts the duty and financial burden of removal upon the United States, except insofar as it could reimburse itself from the salvage.

The District Court held for the United States upon the ground that the floating dry dock was neither a vessel nor a craft, and, alternatively, that, if it was, the grounding was intentional. On appeal the United States urges as additional support that even if not intentional the grounding was negligent and this defeats the owner's right of abandonment. We conclude that the judgment cannot be supported on either ground or upon the alternative supporting ground advanced on appeal by the United States.

The floating dry dock was of wooden construction. It was composed of six trussed sections numbered 1, 2, 3, 4, 5 and 7.[1] It had an overall length of 360 feet, a width of 100 feet, and it was 45 feet high. It had a capacity of 9400 tons.

Bethlehem had purchased the dock in 1930, at which time it was approximately ten years old. It was then towed section by section from Charleston, South Carolina to Bethlehem's Key Highway Yard in Baltimore, Maryland, where it was in substantially continuous use as a floating dry dock through October 4, 1962, only thirteen days before the tow commenced which resulted in its wreckage.

Earlier, Bethlehem had decided to dispose of the dry dock, which was then, apparently, in good condition and regular use. Bethlehem had closed some of its yards in New York Harbor and had decided to replace the 9400-ton floating dry dock with another of larger capacity made surplus by the New York closings. The replacement dock was one of 20,000-ton capacity. That decision made, Bethlehem then turned to the disposition of the 9400-ton dock.

Bethlehem considered beaching the dry dock and burning it, but the landowners it contacted were unwilling to have their properties used for such a purpose. An inquiry was addressed to the Maryland Port Authority which declined to suggest approval of a sinking anywhere in Chesapeake Bay, but, after suggesting the possibility of beaching and burning it,[2] mentioned that it might be sunk at sea. Bethlehem then contacted the Army Engineers, from whom they learned that the engineers had no rules prohibiting the scuttling of the dry dock at sea at or beyond the thousand fathom curve, and that, if sunk there, the Navy had no interest and the Coast Guard no jurisdiction.

Bethlehem then decided to have the dry dock towed out to sea and sunk beyond the thousand fathom curve. It entered into a contract with Moran Towing & Transportation Company, Incorporated to take it to sea.

On October 17, 1962, only thirteen days after the last day on which the dock had been in use, two of Moran's tugs took it under tow. They departed Bethlehem's Key Highway Yard at approximately 6:45 P.M., and, twenty minutes after midnight, the flotilla hove to

---

1. At an earlier time there had been a seventh section numbered six in between sections 5 and 7.

2. Beaching and burning, it thought unobjectionable, provided the total hulk was burned, that is its underwater as well as its above water portions. This seemed impractical.

near Chesapeake Bay Bridge to await further information about a storm reported off the Carolina Coast. The weather was good, the sea calm, and the tide was only three quarters of a knot. The flotilla steamed into the tide at three-quarters of a knot, so that it had no motion over the ground.

At 5:30 o'clock on the morning of October 18 the dock was riding well and normally, but at 5:45 there was an obvious list at the forward port corner of the forward section, that being No. 7. The foremost port compartment of the No. 7 pontoon was found to be filling rapidly. Pumps, provided for that purpose, were placed in operation in No. 5 pontoon, but it, too, began to fill about 7:00 o'clock. Meanwhile, the Captain of the flotilla decided that prudence required a return to the Key Highway Yard. He shifted the lead tug to the after end of the dock, and at 6:50 o'clock in the morning began a return trip up the Bay. This placed the pontoon sections which were taking on water at the starboard after end of the return movement of the flotilla.

In Brewerton Channel, an entrance to Baltimore Harbor, the after starboard end of the dry dock began to hit bottom. By this time representatives of Bethlehem, who had been notified, had come out to meet the flotilla and were present. After radio-telephone consultation with another Bethlehem official at Key Highway Yard, which is in the inner harbor, it was decided to turn out of the channel toward Bethlehem's Sparrows Point steel plant. It then appeared most unlikely that the sinking dry dock could be successfully towed to the Key Highway Yard, and Sparrows Point, at the entrance to Baltimore Harbor, was immediately at hand.

The dry dock finally grounded in 21 feet of water off Sparrows Point some 250 yards north of Brewerton Channel, but well short of land controlled by Bethlehem. The tugs could move it no farther.

Though the wreck did not menace traffic in any dredged channel, it was in waters of Baltimore Harbor which are technically navigable and readily usable by vessels of shallow draft and small craft. The United States regarded the wreck as a menace to navigation and sought its removal. It declined to accept its abandonment, which Bethlehem tendered shortly after the foundering.

Since the oral argument, the Court has been informed that the dry dock has been removed by the United States at a cost of $163,000.

It may be helpful at the outset to take a brief general look at the relevant statutes, all of which are derived from the Rivers and Harbors Act of 1899.

Title 33 U.S.C.A. § 401, derived from § 9 of the Rivers and Harbors Act of 1899, prohibits the construction of bridges, dams, dikes and causeways in or over navigable waters without prior approval of the Chief of Engineers and the Secretary of the Army.

33 U.S.C.A. § 403, derived from § 10 of the Act, the full text of which is set forth in the margin,[3] prohibits the creation of any obstruction to the navigable capacity of waters of the United States unless authorized by the Congress. The section declares that the building or the commencement of the building of any

3. "The creation of any obstruction not affirmatively authorized by Congress, to the navigable capacity of any of the waters of the United States is prohibited; and it shall not be lawful to build or commence the building of any wharf, pier, dolphin, boom, weir, breakwater, bulkhead, jetty, or other structures in any port, roadstead, haven, harbor, canal, navigable river, or other water of the United States, outside established harbor lines, or where no harbor lines have been established, except on plans recommended by the Chief of Engineers and authorized by the Secretary of the Army; and it shall not be lawful to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of, any port, roadstead, haven, harbor, canal, lake, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless the work has been recommended by the Chief of Engineers and authorized by the Secretary of the Army prior to beginning the same."

wharf, pier, dolphin, boom, weir, break-water, bulkhead, or jetty shall not be lawful unless done pursuant to plans recommended by the Chief of Engineers and authorized by the Secretary of the Army. It also declares it shall not be lawful to excavate, fill or alter the course, condition or capacity of any port or similarly enclosed waters or of a canal or the channel of any navigable waters of the United States, unless the work has been authorized by the Secretary of the Army upon the recommendation of the Chief of Engineers.

Section 404, derived from § 11 of the Act, authorizes the Secretary of the Army to establish harbor lines and prohibits the extension of piers, wharves, bulkheads, or other works or deposits beyond the harbor lines, except pursuant to regulations prescribed by the Secretary of the Army.

Section 406, derived from § 12 of the Act, provides a penalty for the wrongful construction of bridges, piers and similar structures and provides for their removal. It declares any violation of §§ 401, 403 or 404 shall be a misdemeanor and specifically authorizes district courts to issue injunctions requiring the removal of any structure, or part of a structure, erected in violation of those sections.

Section 409 of Title 33, which was § 15 of the Act, the text of which is set forth in full in the margin,[4] relates to the obstruction of navigable waters by vessels or other craft. It provides that the anchorage of vessels or other craft in a navigable channel in such a way as to hinder the passage of other vessels or craft is unlawful. It also makes it unlawful voluntarily or carelessly to sink or permit the sinking of a vessel or other craft in a navigable channel or to float loose logs or sack rafts in streams used by steamboats in such a manner as to obstruct the navigation of vessels. It then provides that whenever a vessel, a raft, or other craft is wrecked and sunk in a navigable channel, accidentally or otherwise, the owner must immediately mark the wreck and promptly commence its removal. Failure to commence the immediate removal of the wreck shall be considered an abandonment and subject the craft to removal by the United States.

Section 411, derived from a portion of § 16 of the Act, provides that any violation of § 409, or certain other sections with which we are not now concerned, shall be a misdemeanor. A violator is subject to a fine of not less than $500 nor more than $2500. In what is now § 412 of Title 33, § 16 of the Act further provided that any willful obstruction of the channel of any waterway in the manner contemplated in § 409 by any master, pilot or engineer shall also constitute a violation of other sections of the Act, including § 403, and shall result in the revocation or suspension of his license.

Sections 414 and 415, which were, respectively, §§ 19 and 20 of the Act[5] au-

4. "It shall not be lawful to tie up or anchor vessels or other craft in navigable channels in such a manner as to prevent or obstruct the passage of other vessels or craft; or to voluntarily or carelessly sink, or permit or cause to be sunk, vessels or other craft in navigable channels; or to float loose timber and logs, or to float what is known as 'sack rafts of timber and logs' in streams or channels actually navigated by steamboats in such manner as to obstruct, impede, or endanger navigation. And whenever a vessel, raft, or other craft is wrecked and sunk in a navigable channel, accidentally or otherwise, it shall be the duty of the owner of such sunken craft to immediately mark it with a buoy or beacon during the day and a lighted lantern at night, and to maintain such marks until the sunken craft is removed or abandoned, and the neglect or failure of the said owner so to do shall be unlawful; and it shall be the duty of the owner of such sunken craft to commence the immediate removal of the same, and prosecute such removal diligently, and failure to do so shall be considered as an abandonment of such craft, and subject the same to removal by the United States as provided for in sections 411–416, 418, and 502 of this title."

5. Section 19, 33 U.S.C.A. § 414 provides:
"Whenever the navigation of any river lake, harbor, sound, bay, canal, or other navigable waters of the United States shall be obstructed or endangered by any

thorize removal by the United States of sunken craft which have been abandoned or which create an emergency condition. Section 414 provides that when navigable waters of the United States are "obstructed or endangered" by "any sunken vessel, boat, water craft, raft, or other similar obstruction," the craft, if abandoned, shall be subject to removal or other disposition by the Secretary of the Army without liability for any damage to the owners. The Secretary may, in his discretion, so condition contracts for removal that the craft and cargo so removed shall become property of the contractor. The section also provides that any money realized by the United States from the sale or removal shall go into the treasury. Section 415 gives the Secretary authority under emergency to summarily remove a sunken vessel obstructing navigation before abandonment has been established and provides that the expense of such removal shall be a charge against the vessel and its cargo. Should the owner of the vessel fail to reimburse the United States for the expense of removal, the vessel and its cargo may be sold and the proceeds covered into the treasury.

sunken vessel, boat, water craft, raft, or other similar obstruction, and such obstruction has existed for a longer period than thirty days, or whenever the abandonment of such obstruction can be legally established in a less space of time, the sunken vessel, boat, water craft, raft, or other obstruction shall be subject to be broken up, removed, sold, or otherwise disposed of by the Secretary of the Army at his discretion, without liability for any damage to the owners of the same: *Provided,* That in his discretion, the Secretary of the Army may cause reasonable notice of such obstruction of not less than thirty days, unless the legal abandonment of the obstruction can be established in a less time, to be given by publication, addressed 'To whom it may concern,' in a newspaper published nearest to the locality of the obstruction, requiring the removal thereof: *And provided also,* That the Secretary of the Army may, in his discretion, at or after the time of giving such notice, cause sealed proposals to be solicited by public advertisement, giving reasonable notice of not less than ten days, for the removal of such obstruction as soon as possible after the expiration of the above specified thirty days' notice, in case it has not in the meantime been so removed, these proposals and contracts, at his discretion, to be conditioned that such vessel, boat, water craft, raft, or other obstruction, and all cargo and property contained therein, shall become the property of the contractor, and the contract shall be awarded to the bidder making the proposition most advantageous to the United States: Provided, that such bidder shall give satisfactory security to execute the work: *Provided further,* That any money received from the sale of any such wreck, or from any contractor for the removal of wrecks, under this paragraph shall be covered into the Treasury of the United States."

Section 20, 33 U.S.C.A. § 415 provides:

"Under emergency, in the case of any vessel, boat, water craft, or raft, or other similar obstruction, sinking or grounding, or being unnecessarily delayed in any Government canal or lock, or in any navigable waters mentioned in section 414 of this title, in such manner as to stop, seriously interfere with, or specially endanger navigation, in the opinion of the Secretary of the Army, or any agent of the United States to whom the Secretary may delegate proper authority, the Secretary of the Army or any such agent shall have the right to take immediate possession of such boat, vessel, or other water craft, or raft, so far as to remove or to destroy it and to clear immediately the canal, lock, or navigable waters aforesaid of the obstruction thereby caused, using his best judgment to prevent any unnecessary injury; and no one shall interfere with or prevent such removal or destruction: *Provided,* That the officer or agent charged with the removal or destruction of an obstruction under this section may in his discretion give notice in writing to the owners of any such obstruction requiring them to remove it: *And provided further,* That the expense of removing any such obstruction as aforesaid shall be a charge against such craft and cargo; and if the owners thereof fail or refuse to reimburse the United States for such expense within thirty days after notification, then the officer or agent aforesaid may sell the craft or cargo, or any part thereof that may not have been destroyed in removal, and the proceeds of such sale shall be covered into the Treasury of the United States."

## I

### WAS THE DRY DOCK A VESSEL OR CRAFT WITHIN THE MEANING OF THE WRECK ACT?

█ It is readily apparent that the Rivers and Harbors Act of 1899 was concerned with two, largely if not wholly, mutually exclusive classifications. In §§ 401 and 403, there are prohibitions against the construction of bridges, dams, dikes, causeways, walls, piers, dolphins, booms, weirs, breakwaters, bulkheads and jetties without the prior approval of the Chief of Engineers and the Secretary of the Army, if they extend into or over navigable waters. Excavating, filling or altering the course or capacity of any port, canal or channel is similarly prohibited, unless authorized, and the prohibitions of § 403 are introduced by a general prohibition of any obstruction to the navigable capacity of waters without congressional authorization. These prohibitions are directed, generally, to structures and the product of construction work deliberately erected or created and intruding into or over navigable waters. The primary remedy provided for the removal of any such unauthorized structure is a mandatory injunction requiring its creator to remove the structure or obstruction. The removal, of course, is at the expense of the offender.

█ In contrast, §§ 409, 411, 412, 414 and 415, collectively known as the Wreck Act, apply to obstructions in navigable waters created by vessels or other water craft anchored, moored or sunk in navigable waters. Section 409 contains a prohibition against the voluntary or careless sinking of a vessel in a channel, and § 412 makes a willful obstruction by a master, pilot or engineer of a channel in violation of § 409 a violation also of §

403, with a resulting revocation or suspension of his license.

█ With respect to sunken vessels, however, §§ 409, 414 and 415 clearly recognize the right of abandonment by the owner, and they cast upon the United States the duty and financial burden of removal of an abandoned wreck, except insofar as the United States may reimburse itself from the salvage. The duty of the owner of a foundered vessel is limited to the maintenance of appropriate marking of the wreck until it is either removed or abandoned. After abandonment, even the duty of maintaining adequate marking of the wreck for the protection of other vessels is cast upon the United States.

It is necessary initially, therefore, to decide whether this dry dock was "a vessel, raft or other craft" within the meaning of the Wreck Act so as to make available to the owner the statutory right of abandonment.

In other contexts, a floating dry dock in service, permanently moored to the shore, has been held not to be a "vessel" for purposes of salvage,[6] or for limitation of liability.[7] Shipyard workers upon such a dry dock are not the members of a crew of a vessel in navigation.[8]

The dry dock in service, permanently moored to the land, has most of the attributes of such an extension of the land as a wharf or a dock, but it does not retain that character when it has been severed from its attachments to the land and when, under tow, it is moving over navigable waters equipped, as this one was, with a vessel's navigation lights.

We have held several strange craft to be vessels. A floating derrick engaged in pouring concrete for a bridge is one.[9] So is a barge moored behind piles on a river bank and serving as a platform for coal cleaning machinery.[10]

6. Cope v. Vallette Drydock Co., 119 U.S. 625, 75 S.Ct. 336, 30 L.Ed. 501.

7. Berton v. Tietjen & Lang Dry Dock Co., D.N.J., 219 F. 763.

8. Bernado v. Bethlehem Steel Company, 2 Cir., 314 F.2d 604; DeMartino v.

Bethlehem Steel Company, 1 Cir., 164 F.2d 177.

9. Summerlin v. Massman Const. Co., 4 Cir., 199 F.2d 715.

10. Jeffrey v. Henderson Bros., 4 Cir., 193 F.2d 589.

We have held that a floating pile driver is a vessel.[11] There are similar holdings elsewhere. Even an offshore drilling platform resting on legs extending to the bottom of the sea has been held to be a vessel.[12]

There are statutory definitions of a vessel. In 1 U.S.C.A. § 3 and 33 U.S.C.A. § 144(c) (i) (except a seaplane), it is defined as "every description of water craft used or capable of being used as a means of transportation on water." As indicated above, the definition is held to extend to relatively permanent or stationary structures which are in no sense, when serving their primary function, engaged in transportation. Their capability, though more theoretical than practical, brings them within the definition.

This floating dry dock was as capable of use as a means of transportation on water as other specialized craft which have been held to be vessels. During much of the voyage we have described, it had a crewman aboard. It carried portable pumps and navigation lights. It was not designed to carry cargo, but it had been regularly employed in lifting and supporting ocean-going vessels, and there is no reason to suppose that, if occasion arose, it could not have been used, under tow, for the movement of objects from one place to another.

▉ Moreover, in the Wreck Act, itself, there is every indication of a congressional intention that the Act not be narrowly applied to conventional vessels only. It expressly applies to vessels, rafts and other craft. Sections 414 and 415 refer repeatedly to any "sunken vessel, boat, water craft, raft, or other similar obstruction." These should not be read as mere redundancies, but the abandonment principle with its public burden of clearance and removal should apply to any obstruction similar to that of a sunken vessel. They encompass, generally, all objects designed and intended to float on navigable waters which, when sunk, would create an obstruction similar to that of a sunken vessel.

A raft of logs is certainly not a conventional vessel, and it has no greater capability for use as a means of transportation than did this dry dock,[13] but a raft of logs is expressly within the reach of the Wreck Act.

▉ We conclude that this floating dry dock while unmoored and under tow was within the Wreck Act, too. When it foundered while under tow, it created an obstruction of the genus of sunken vessels, rafts, craft and similar obstructions.[14] The obstruction is quite unlike the bridges and highways, the piers and the jetties to which §§ 401 and 403 are directed.

A recent decision of the United States Court of Customs and Patent Appeals in the case of United States v. Bethlehem Steel Company (decided August 4, 1966) does not persuade us to the contrary.

The Court of Customs and Patent Appeals was there concerned with the question of whether certain ship "midbodies" were dutiable. It held that they were because they were not vessels within the statutory definition of the term.

In that case it appeared that conversion of an old T–2 or T–3 tanker into a large ore carrier could be effected by removing the bow and stern sections of the tanker from the midsection, and replacing the old midsection with a new, much longer one. Some of the new midsections were constructed in European yards. Equipped with a temporary bow section and a reinforced stern, each was towed across the Atlantic Ocean to an American yard where the old tanker bow

---

11. Leary Const. Co. v. Matson, 4 Cir., 272 F. 461.

12. Offshore Company v. Robison, 5 Cir., 266 F.2d 769, 75 A.L.R.2d 1296.

13. A raft of logs has been held to be a vessel, however, The Mary, S.D.Ala., 123 F. 609; United States v. Marthinson, E.D.S.C., 58 F. 765; and Seabrook v. Raft of Railroad Cross Ties, D.S.C., 40 F. 596.

14. Surely, as Bethlehem points out, after the foundering of the dry dock, Bethlehem would not be relieved of its duty under § 409 of marking the wreck because it was not a vessel, raft or other craft.

and stern sections were to replace the temporary arrangements effected in Europe. During the ocean crossing, each of these "midbodies" had sleeping accommodations for a crew of eight, each of whom had signed on as a seaman. There were generators for electric power, and light, heat, power, food and radio facilities were all available on each "midbody." Each, of course, carried navigational lights and signals.

Vessels, the carriers of dutiable commodities, have traditionally been, themselves, exempt from duty. The importers claimed the traditional, implicit exemption for the "midbody." The Customs Court, Second Division, sustained their protest, but the Court of Customs and Patent Appeals reversed, placing its decision upon the ground that the "midbodies" did not fall within the statutory definition of a vessel, despite the equipment and crew each carried and despite the further fact that it was said to be capable in its then condition of carrying 14,000 tons of cement.

A very different consideration affected the judgment of the Court of Customs and Patent Appeals in deciding whether or not the "midbodies" were subject to duty. The exemption was not a statutory one, and the Court was concerned with the protection of American industry, shipyards and employees. It was conscious of the fact that if the component parts had been imported from Europe, each would have been subject to duty, and there may have been some reason for treating sub-assemblies, even sub-assemblies as complete and extensive as the "midbodies," as dutiable also. The holding that they were not vessels within the meaning of the traditional exemption from the customs acts, though grounded upon the statutory definition of vessels, does not persuade us that such "midbodies" are not vessels, rafts or other craft within the meaning of the Wreck Act. We think that they clearly were and that, sunk in a navigable channel,

one of them would constitute an obstruction, in all respects, similar to the wreck of a vessel complete with permanent bow and stern, which the owner would be required by § 409 to mark and which is subject to abandonment by the owner. That brings it within the literal language of the Wreck Act.

## II
### WAS THE SINKING OF THE DRY DOCK INTENTIONAL?

■ The District Court indicated that even if the dry dock was a vessel within the meaning of the Wreck Act, § 409 would not extend the right of abandonment to an owner who intentionally sank his vessel. It found that, while the original intention was not to sink the dry dock in the harbor, after an emergency arose as a result of Bethlehem's negligence, Bethlehem and Moran "deliberately decided to sink the dock in the harbor."

Under a predecessor of § 10 of the Rivers and Harbors Act of 1899, it was held that a ship intentionally scuttled by its owners created an obstruction which the owner could be compelled to remove at its expense.[15]

In *Hall*, after fire had broken out in a ship and gotten beyond control so that the hull was certain to be lost, the ship was intentionally sunk in a harbor in order to save the rigging from the fire and to permit its salvage by the owner. It was held that such an intentionally created obstruction was a violation of § 10 of the Rivers and Harbors Act of 1890, substantially comparable to § 10 of the Act of 1899, which is now § 403. This suggests that § 15 of the Wreck Act,[16] with its exoneration of the owner, except for the *in rem* liability of the sunken vessel and its cargo, should not be extended for the benefit of the owner when the sinking was the deliberate and intended purpose of the owner in furtherance of his financial interest. The fact that § 412 makes a willful obstruction

15. United States v. Hall, 1 Cir., 63 F. 472; see also, In re Eastern Transportation Co., D.Md., 102 F.Supp. 913, aff'd sub nom. Ottenheimer v. Whitaker, 4 Cir., 198 F.2d 289.

16. 33 U.S.C.A. § 409.

of a channel, in violation of § 409, also a violation of § 403 may lend some support to the suggestion.

The present case is far from that principle, however.

There was a general original purpose, of course, to sink the dry dock. This purpose arose after it had been found impossible to dispose of the dry dock in the Bay, when no riparian owner would permit use of his land for the purpose of burning the dock and when burning was made impractical by the requirement that its underwater portion be consumed by fire as well as its above water portion. It had been suggested that the dry dock could be sunk beyond the thousand fathom curve, approximately 85 miles at sea, and Bethlehem had obtained official clearance for that venture, contracting to pay Moran a fee of $10,000 for the towage. Clearly, at the outset, however, no one intended to sink the dry dock in the Bay or in Baltimore Harbor, and when sections No. 5 and 7 began to take on water, the purpose of the turn back to Bethlehem's Key Highway Yard was to avoid the possibility of an unintentional sinking in the Bay or the harbor. It was then thought that the flotilla could make the return trip to the Key Highway Yard, but when the stern starboard section of the dock began to hit bottom in Brewerton Channel, it appeared impossible to achieve the Key Highway Yard destination. It was then that the flotilla turned from the channel and headed toward Bethlehem's Sparrows Point steel plant. With the dock riding so low at the stern, there may have seemed little chance that it could reach waters actually controlled by Bethlehem, and it was then known that the dock was in a sinking condition, but the turn out of the channel was for the purpose of minimization of prospective harm. Sharp criticism would justifiably have been levelled at Bethlehem and Moran if they had permitted the dry dock to founder in and obstruct one of the main ship channels in Baltimore Harbor. What was done was dictated by prudence and was accompanied by a strenuous effort to avoid the creation of an extremely hazardous and major obstruction.

Indeed, the District Court found that the initial decision to turn back to Key Highway Yard and the later decision to turn out of Brewerton Channel were both reasonable choices of unpleasant alternatives. Under those circumstances, we cannot accept the ultimate conclusion that there was a deliberate decision to sink the dock in the harbor. The master of a sinking vessel who does all he can to maneuver out of and away from the main channel of commerce can hardly be said to have deliberately decided to sink the ship where it ultimately founders despite the best efforts to keep her afloat. There was no overt intent to sink the dock in the harbor. That result was neither sought nor desired. No one acted for the purpose of achieving that result. Even after she foundered, the tugs continued their efforts to move her, and continuous pumping of the flooded compartments was maintained for many hours.

This was not a deliberate, intentional sinking.[17]

■ The fact that the District Court found that the sinking was the consequence of an inadequate inspection of the dry dock before it began its journey, a finding of negligence which Bethlehem stoutly denied, did not affect the nature or character of its subsequent volition. There is no suggestion that the dry dock, if unseaworthy at the commencement of the journey, was known by Bethlehem or Moran to have been so at that time. There is no suggestion of any doubt as to her capability to make the voyage to the Atlantic graveyard. What was done after she began to take on water was done in emergency because of the necessities of the situation. Even intentional

17. See Pollock, First Book of Jurisprudence (6th ed. 1929) 147; Prosser, Torts (2d ed. 1955) 29; Perkins, a Rationale of Mens Rea, 52 Harv.L.R. 905, 911; Holmes, The Common Law (1881) 132; Salmond, Jurisprudence (2d ed. 1907) 328, 339–340.

violations of § 409 are condoned and approved if done under necessity.[18] This is so even though negligence played a part in the creation of the emergency.[19]

## III

### DOES THE PRESENCE OF NEGLIGENCE DEFEAT THE RIGHT OF ABANDONMENT?

The District Court rejected the contention that when a vessel founders as a result of negligence attributable to the owner, the owner has no right of abandonment under the Wreck Act. Here the United States strongly urges its contention that the owner does not, and it now has the support of a recent decision of the Fifth Circuit in United States v. Cargill, Inc., 5 Cir., 367 F.2d 971. We agree with the District Court.

In *Cargill,* it appears that two barges broke from their moorings and sank in the Mississippi River. A few days earlier another barge laden with chlorine gas, placed in the first tier of a tow, removed from immediate observation of the pilot house and bearing the brunt of the sea and the weather, sank. Because of its cargo, agencies of the United States thought special precautions requisite, and the tanks of chlorine gas were ultimately removed by the United States after spending some $3,081,000 on the project. In the companion cases, decided in the same opinion by the Fifth Circuit, judgments upholding the abandonment of the three barges were reversed and the cases remanded for trial of the factual issues of negligence and causation.

*Cargill* represents an abrupt departure from the theretofore uniform interpretation of the Wreck Act. It had been consistently held that § 403 had no applica-

tion to the obstruction of navigable waters by a wrecked vessel, at least, if the sinking was unintentional.[20] Some of the cases [21] are not flat decisions that under no condition may § 403 be applied to the wreck of a vessel. They recognize the Hall exception,[22] which we have considered earlier, where the owner intentionally scuttled his burning vessel to save the rigging from the fire. They limit the exception to that kind of deliberate scuttling, however, and permit the abandonment of the vessel despite the existence of a claim that the sinking was the result of negligence attributable to the owner.

The decision in *Cargill* is presaged only by Judge Browning's dissent in *The Texmar.*

There are two other cases on the periphery of the problem which the United States contends points to the *Cargill* conclusion.

United States v. Republic Steel Corp., 362 U.S. 482, 80 S.Ct. 884, 4 L.Ed.2d 903, sanctioned an injunction against a deliberate and continuing deposit of industrial wastes in navigable waters with a resulting silting of the channel. This was plainly a violation of the § 403 prohibition against filling or altering a navigable channel. There was no question of § 403's applicability. The difficulty arose from the fact that § 406, which authorized an injunction to enforce § 403, is limited to the removal of unauthorized structures. The Supreme Court found in § 403 an implied authorization of an injunction to prohibit a deliberate and continuing violation of that section. Its holding intimates no extension of §

---

**18.** Atlantic Refining Co. v. Moller (Bohemian Club), 320 U.S. 462, 64 S.Ct. 225, 88 L.Ed. 168; The City of Norfolk, 4 Cir., 266 F. 641.

**19.** Atlantic Refining Co. v. Moller (Bohemian Club), supra.

**20.** United States v. Bethlehem Steel Co. (The Texmar), 9 Cir., 319 F.2d 512; United States v. Zubik, 3 Cir., 295 F.2d 53; United States v. Wilson, 2 Cir., 235 F.2d 251; In re Eastern Transportation Co., D.Md., 102 F.Supp. 913, aff'd Otten-

heimer v. Whitaker, 4 Cir., 198 F.2d 289; The Manhattan, E.D.Pa., 10 F.Supp. 45, aff'd, 3 Cir., 85 F.2d 427; United States v. Cargo Salvage Corp., S.D.N.Y., 228 F.Supp. 145; United States v. Bridgeport Towing Line, Inc., D.Conn., 15 F.2d 240; Loud v. United States, 6 Cir., 286 F. 56.

**21.** See *Bridgeport Towing Lines, Inc., Wilson* and *Zubik,* supra.

**22.** United States v. Hall, 1 Cir., 63 F. 472.

403 to shipwrecks beyond the *Hall* exception of a deliberate scuttling.

In United States v. Perma Paving Co., 2 Cir., 332 F.2d 754, the government sought reimbursement for its expense in dredging a channel into which Perma Paving had forced silt by overloading its property. This was held to have been a violation of § 403 in its prohibition against filling channels. It was also held that, since the government might have compelled Perma Paving to remove the silt, it could recover its reasonable expenses in doing so. In discussing the question of *in personam* liability, reference was made to the cases holding a negligent owner of an abandoned shipwreck immune from personal liability for its removal, and the Court said, at page 758:

> "We need not determine whether if that precise issue should arise in this circuit, we would follow those decisions or Judge Browning's dissent in the Bethlehem case. It is enough here that the detailed provisions with respect to wrecked vessels contained in 33 U.S.C. §§ 409, 411, 412, 414 and 415, afford a far stronger basis for immunizing the owners of wrecked vessels from *in personam* liability for the costs of removal than any of the statutes relevant to this case. Indeed, the author of the principal opinion in the Bethlehem case seemingly assumed that the Government could have recovered the costs of dredging the channel on the facts in Republic Steel. 319 F. 2d 518."

Though, in our view, peripheral, *Republic Steel* and *Perma Paving* are the inspiration for the new look that the Ninth Circuit focused on the statutes and of the theory which the Fifth Circuit has adopted. This fresh reappraisal requires a similar review in this Court.

Judge Browning's approach, in his dissent in *The Texmar*, essentially is that, while the Wreck Act specifically defines the rights of the United States to remove the obstructions of abandoned vessels and to retain the salvage of vessel and cargo, it does not specifically provide that a negligent owner has no *in personam* liability for the excess removal costs of the United States. Since the Act prohibits careless sinkings in navigable channels, he would imply an appropriate remedy of an enforceable *in personam* liability, just as the Supreme Court in *Republic Steel* found an implied injunctive remedy to prevent a continuing and deliberate violation of § 403. He found comfort in the cases which held or assumed that an owner, who intentionally scuttled his ship, could not escape such *in personam* liability, since the proscription of § 409 applied equally to intentional and careless sinkings.

There are several difficulties with that approach.

It would be supposed that no one ever had reason to believe that he had a right to fill with industrial wastes a navigable channel in use by vessels in commerce. Any such belief could not have survived the earliest predecessors of § 10 of the Rivers and Harbors Act of 1899. It was plain that he was not to do it, and it was no great extension of the statute to hold, as the Supreme Court did in *Republic Steel*, that there was an implied injunctive remedy to terminate a deliberate and continuing violation. *Perma Paving* added a reasonable and logical remedy for the rectification of an established wrong; if one can be required by an affirmative injunction to remove the silt he has deposited in a navigable channel, he may be required to reimburse the United States for its reasonable costs in effecting the removal for him.

In contrast, there has been a recognized right of abandonment of a wrecked vessel, unless scuttled intentionally, without any *in personam* liability for the cost of its removal even if it is an obstruction of navigable waters. This was the assumption of the Congress which enacted the Wreck Act. That was the conclusion of the Court in The Manhattan (United States v. Atlantic Refining Co.), E.D.Pa., 10 F.Supp. 45, citing Winpenny and Chedester v. City of Philadelphia, 65 Pa. 135. Abandonment had been recognized in § 8 of the Act of September 19, 1890,

26 Stat. 450, which was substantially repeated in 1899 as § 19 of the Wreck Act. The addition of the provisions of § 15 significantly worked no change in the provisions of the 1890 act.

If there was a recognized immunity from an *in personam* liability for the excess cost of removal of an abandoned wreck when the Congress enacted the Wreck Act in 1899, there can be no logical inference of liability in this area by analogy to *Republic Steel* or *Perma Paving*. All of the relevant cases, far closer to the understanding and assumptions of the times than we, find such an immunity predating or implicit in the Wreck Act.[23] This lends weight to their expositions, and undermines any analogy to be drawn from *Republic Steel* and *Perma Paving*.

■ The theory's (Judge Browning's) reliance upon *Hall* and the subsequent cases, which have recognized the duty of an owner of a ship which creates an obstruction to navigation as a result of an intentional scuttling to remove the obstruction and to pay for the excess cost of removal, seems misplaced, for the Wreck Act itself drew the distinction between willful and negligent sinkings. Intentional and careless sinkings are equally proscribed by § 409, if they create obstructions of navigable waters, but § 412 makes a willful obstruction of a channel by a master or pilot in violation of § 409 a violation also of § 403. This was not so apparent in the Act of 1899, but the present codification of § 16 of the Act does draw a legislative distinction between channel obstructions created intentionally and those created carelessly with respect to the liabilities of the person in charge of the vessel and the penalties to be imposed. The codifiers' construction seems reasonable, for the provision in § 16 of the Act specifically making a willful violation of § 16 "a violation of the Act" would have been wholly redundant if not intended to bring it within the proscription of some other section, most logically § 10. An intentional creation of an obstruction of a channel by the scuttling of a vessel has thus been made referable under § 412 to § 403 and its related provisions for mandatory injunctions, but a negligent sinking is not. This is consistent with the general statutory scheme, which we considered in Part I of this opinion. The kind of deliberately erected structure which § 403 contemplates, must be removed at the expense of the owner when it constitutes an unauthorized obstruction of navigable waters, and an injunction is specifically authorized. In contrast, under the Wreck Act, the only expressed consequence of an owner's failure to remove a sunken vessel, if the obstruction was not "willfully" created, is to give the United States the right to treat it as abandoned, remove it and retain the salvage. In this, the statutes draw no distinction between careless and innocent sinkings.

*Cargill* adds the rationalization that the nation's waterways exist and, at considerable expense, are maintained by the government for public use, and that no one with substantial impunity ought to be allowed negligently to create obstructions in them. There has been, however, a long history of governmental encouragement and support of water-borne commerce. The modern ship construction and operating subsidies are extreme examples. It has thus been thought that the theory of the abandonment principle was that the owner who has lost his vessel has suffered all of the economic loss which should be visited upon him, and that removal of the wreck, if it constitutes an obstruction to commerce, should be a public obligation.[24] The risk of such lia-

---

23. See cases cited in footnote 20.

24. See H.R.Rep. No. 1826, 55th Cong. 3d Sess. p. 4 (1899) expressing the purpose of the similar provisions of the River and Harbor Appropriation Act of 1899 to "give to the owners of wrecks and abandoned property all possible protection. consistent with the essential interests of navigation." See, also, The Manhattan (United States v. Atlantic Refining Co.) E.D.Pa., 10 F.Supp. 45; United States v. Bethlehem Steel Co. (The Texmar) 9 Cir., 319 F.2d 512, 522.

bilities might be a very substantial deterrent of maritime activity or the acceptance of hazardous cargo. The owner of the barge laden with chlorine gas with which *Cargill* dealt is an example. The Government's claim exceeds $3,000,000.[25]

Moreover, since in almost every foundering there will be some basis for a claim of negligence on the part of the owner or operator, extension of an *in personam* liability for a negligently created obstruction would result in great uncertainty and extensive litigation before the obligations of the owners and operators can be ascertained. The old rule, the one which logically derives from the statutes, at least has the virtue of clarity and certainty in application.

■ For these reasons, we conclude that neither Bethlehem nor Moran, after the tendered abandonment, had any obligation to remove the obstruction created by the sunken dry dock and no *in personam* liability to reimburse the United States for its costs of removal.

We do not consider Bethlehem's contention that the finding of negligence on its part was erroneous, for, even if it was negligent, liability cannot be imposed upon it.[26]

Reversed.

SOBELOFF, Circuit Judge (dissenting).

For more than thirty-two years, from 1930 to 1962, Bethlehem Steel Company kept in continuous use a 9400 ton floating dry dock, moored at its Key Highway Yard in Baltimore, Maryland. In 1962, Bethlehem decided to install another dock of greater capacity and dispose of the old one. After investigating various alternatives, such as beaching and burning the old dock on nearby property, Bethlehem decided that it would be cheaper to employ Moran to tow it to sea and sink it there. The journey was undertaken in the early evening of October 17, 1962 but, according to the District Court's detailed findings, neither Bethlehem nor Moran had adequately inspected the dock to ascertain whether it was in condition to withstand the trip. Early on the morning of October 18, the dock began to ship water through one of its pontoons and it was decided to return it to Key Yard. On the way back, however, it filled and foundered and was eventually grounded near Sparrows Point.

The Government demanded removal of the wreck by Bethlehem, but Bethlehem declined. The United States then sued to compel Bethlehem to effect removal, and the District Court, after a full hearing, ordered Bethlehem to remove or pay the cost of removal. Since the hearing of this appeal, the United States, deeming the sunken dry dock a menace to navigation, did remove it at an expense of $163,000. In its present posture, therefore, the action is one for the recovery of these costs.

Although I differ in some respects with the District Court's reasons, I think the result reached is entirely correct. I would affirm. I agree with the majority that the District Court erred in holding that the dry dock is not a vessel within the meaning of the Rivers and Harbors Act. The definition of a "vessel" is, as the majority points out, sufficiently broad to encompass the dock. I also agree that it was not intentionally scuttled so as to bring the case within the *Hall* exception. United States v. Hall,

25. This consideration may have little applicability to a large corporation, such as Bethlehem, or to a vessel bound for the Atlantic graveyard, but the statutes make no distinction between large and small operators or between new and obsolete vessels.

26. It has not been contended in this case that § 409's proscription against voluntary or careless sinkings in "navigable channels" is inapplicable because the point of the final foundering of the dry dock was well clear of Brewerton Channel. We have assumed, therefore, without undertaking to decide, that the proscription is applicable.

63 F. 472 (1st Cir. 1894). But this is by no means dispositive of the case. To my mind, the controlling question on this appeal is whether it was the congressional purpose to immunize owners from liability for the cost of removing from navigable waterways vessels which have sunk as a result of their negligence. I cannot accept the view that Congress meant to bestow a beneficence on careless owners by nullifying the statutorily declared obligation of such persons to remove obstructions caused by them.

Since the Supreme Court's decision in United States v. Republic Steel Corp., 362 U.S. 482, 80 S.Ct. 884 (1960), which, as my brethren recognize, has inspired a "fresh reappraisal" of the Act, two circuits have reached conflicting decisions on the question before us.[1] The Fifth Circuit, in United States v. Cargill, Inc., 367 F.2d 971 (5th Cir. 1966), held that negligently sunk vessels are obstructions within the meaning of section 403 and that under section 406 their owners can be required to bear the reasonable cost of their removal. On the other hand, the Ninth Circuit, in United States v. Bethlehem Steel Corp. (The Texmar), 319 F.2d 512 (9th Cir. 1963), over the strong dissent of Judge Browning, held that removal costs of carelessly sunk vessels must be shouldered by the Government. Judge Browning, differing in approach but agreeing in result with the Fifth Circuit, felt that, by analogy to *Republic Steel,* a remedy should be implied from section 409 sufficiently broad to reach the conduct interdicted therein.[2] This diversity of opinion serves to highlight the fact that clarity of draftsmanship is not a hallmark of the Act. A reading of the statutory provisions, with particular attention to the overall purpose of the Act, is thus called for.

The broad objective of the Rivers and Harbors Act of 1899, 33 U.S.C.A. § 40 et seq., is to keep the nation's waterways free from hazards to maritime commerce.[3] Section 10, 33 U.S.C.A. § 403, prohibits the creation of unauthorized obstructions to navigation and section 15, 33 U.S.C.A. § 409, declares it unlawful "voluntarily or carelessly" to sink vessel in navigable channels. Sections 12, 19 and 20, 33 U.S.C.A. §§ 406, 414 and 415, enable the United States to effect the speedy removal of hazards created in violation of these provisions. In comprehensively unfolding its "great design," *Republic Steel,* supra 362 U.S. at 492, 80 S.Ct. 884, the Act thus brackets the careless owner with the willful one; the distinction drawn is between the innocent, on the one hand, and the deliberate or careless, on the other. While the Act nowhere specifically allocates, as between the Government and the shipowner, the cost of removing sunken vessels, the courts have, since *Hall,* consistently held owners who intentionally scuttle their craft for their private economic benefit personally responsible for removal costs. The statutory grouping of the negligent with the willful militates against different treatment of the two with respect to personal liability.[4] This reading of the Act is identical

1. Even before Republic Steel the precedents were far from consistent. Compare The Manhattan, 10 F.Supp. 45 (D.C.Pa.), aff'd, 85 F.2d 427 (3d Cir. 1935), cert. denied sub nom. United States v. The Bessemer, 300 U.S. 654, 57 S.Ct. 432, 81 L.Ed. 864 (1937) with In re Eastern Transportation Co., 102 F.Supp. 913 (D. Md.), aff'd sub nom. Ottenheimer v. Whitaker, 198 F.2d 289 (4th Cir. 1952).

2. Judge Browning recognized that a negligently sunk vessel may be an obstruction within the meaning of section 403, but preferred to base his dissent on the express prohibition against careless sinking contained in section 409, 319 F.2d at 522 n. 1.

The Second Circuit, in United States v. Perma Paving Co., 332 F.2d 754 (2d Cir. 1964) carefully refrained from expressing an opinion on the issue before us.

3. See United States v. Cargill, 367 F.2d 971 (5th Cir. 1966).

4. Cf. The Limitation of Liability Act, 46 U.S.C.A. § 183, which limits the liability of a vessel owner to his interest in the vessel and its cargo *only* where the owner is without "privity or knowledge" of the negligence causing the loss. See Austerberry v. United States, 169 F.2d 583 (6th Cir. 1948).

to that given it by the Army Corps of Engineers, which has promulgated a long-standing regulation covering the exact situation presented here.

> * * * a person who wilfully or negligently permits a vessel to sink in navigable waters of the United States may not relieve himself from all liability by merely abandoning the wreck. He may be found guilty of a misdemeanor and punished by fine, imprisonment, or both, and in addition may have his license revoked or suspended. He may also be compelled to remove the wreck as a public nuisance or pay for its removal.[5] 33 C.F.R. 209.410 (1962).

I am not persuaded that the separate and detailed treatment accorded sunken vessels in sections 414 and 415 requires the conclusion that the Government's remedies are limited to removal of the wreck and recoupment of the salvage value of it and its cargo. In furtherance of the broad purpose of the Act, these sections are aimed at the vessels themselves and are designed to facilitate removal of wrecks thought to menace navigation. The turn of the language suggests not the grant of a personal immunity to the shipowner but the creation of a right in favor of the United States to eliminate obstructions to navigation. Appropriation of the salvage value of the vessels and their cargo merely gives a measure of protection to the Government against the contingency of an insolvent owner.

Nor is it convincing to argue that such separate treatment reflects a congressional purpose to exclude sunken vessels from the class of "obstructions" proscribed by section 403. The logic and common sense of the Act suggest that the elaborate removal procedures of sections 414 and 415 were intended to supplement the Government's right in section 406 to enjoin the removal of structures threatening navigation. They provide a method whereby the Government may act without the need to secure prior judicial sanction, thus implementing the Act's purpose to expedite the removal of hazards impeding the free flow of maritime commerce.

Further, while it is true that section 412 makes a person in command of a vessel who "willfully" obstructs a channel in the manner contemplated in section 409 guilty of a violation of section 403, this does not warrant the implication of a congressional purpose to limit the reach of section 403 to intentionally scuttled vessels only. The definition of an "obstruction" cannot reasonably be thought to turn on whether a person acts deliberately or carelessly. Navigation is impeded no less by a negligently sunk vessel than by one that has been intentionally scuttled, and it is illogical to ascribe to Congress an intent to exclude carelessly sunk vessels from section 403. Neither does it make sense to read into section 412 a congressional purpose to excuse owners who carelessly cause their vessels to sink, thereby creating obstructions in violation of section 403. Section 412 is aimed at an entirely new class of individuals, masters and pilots, not theretofore encompassed by the Act. Nothing in it supports an attenuation of section

---

**5.** This regulation follows an administrative interpretation by the Acting Secretary of War in 1901, only two years after the Act was passed. In response to an inquiry from an attorney regarding the burden of removing a sunken schooner which had been engaged in dredging the Black River for the City of Loraine, Ohio, the Secretary stated:

> Replying to the question whether the burden of removing this boat rests upon the United States, upon the owner by whose negligence it was sunk, or upon the City of Loraine in whose service the boat was engaged, you are advised that as between the city and the owner of the boat it is not necessary for the War Department to decide, but that under the circumstances stated the burden of removing the boat does not rest upon the United States. It is believed the vessel constitutes an obstruction caused by the voluntary or careless acts of those owning or controlling the boat and that the burden of removal rests upon them.

409's explicit condemnation of both deliberate and careless sinkings and section 403's prohibition against the creation of unauthorized obstructions.

We are not compelled to choose between the reasoning of the Fifth Circuit in *Cargill* and that of Judge Browning in *Texmar*. They are not antithetical; each harmonizes with the language as well as the purpose of the Act. Section 409's proscription of both voluntary and careless sinkings seems, as the Fifth Circuit held, but an "emphatic restatement," 367 F.2d at 975, of section 403's prohibition against the creation of unauthorized obstructions. Yet even in the absence of section 403, the imposition in section 411 of criminal penalties for carelessly causing vessels to sink, coupled with the owner's unquestionable section 409 duty to remove sunken vessels, provides a sufficient basis for implying a civil remedy in favor of the United States in its own right and as the representative of others engaged in maritime commerce. See United States v. Perma Paving Co., 332 F.2d 754, 758 (2d Cir. 1964); Note, Implying Civil Remedies from Federal Regulatory Statutes, 77 Harv.L.Rev. 285 (1963).

In sum, I have no quarrel with the majority's observation that the Government has long followed policies of encouragement and support of water-borne commerce and has been generous in the provision of subsidies in various forms. But nowhere has Congress manifested such unrestrained benevolence towards owners so as to warrant the implication of immunity from responsibility for the negligent sinking of vessels. It is an unwarranted extension of these policies for courts to dilute the clear congressional condemnation in section 409 of carelessness causing obstructions to navigation and the equally clear command to remove. Since the District Court found Bethlehem and Moran negligent in failing adequately to inspect the dry dock, I would affirm the judgment below.